# IN THE UNITED STATES COURT OF APPEALS
## FOR THE THIRD CIRCUIT

---

### Docket No. 20-3321

---

### F.S.,

### Appellant

### v.

### Crestwood School District et al.

### Appellees

---

### Appellant's Brief

---

Appeal from the Order of the Honorable Malachy E. Mannion, United States District Court for the Middle District of Pennsylvania, dated November 3, 2020, which dismissed Plaintiff's action without prejudice based upon the Court's lack of subject matter jurisdiction in light of the Plaintiff's failure to exhaust her administrative remedies under the IDEA.

---

RepkaMazin LLC

Joshua S. Mazin, Esquire
PA Id. #87680
Lucas J. Repka, Esquire
PA Id. #93509
108 East Center Street
Nazareth, Pennsylvania 18064
(610) 365-2670
*Attorneys for Appellant,*
*F.S.*

# TABLE OF CONTENTS

TABLE OF AUTHORITIES .................................................................iii

STATEMENT OF JURISDICTION ..................................................1

STATEMENT OF RELATED CASES
OR PROCEEDINGS ........................................................................3

STATEMENT OF ISSUES ..............................................................4

STATEMENT OF THE CASE ........................................................5

    FACTUAL HISTORY ...............................................................5

    PROCEDURAL HISTORY .......................................................8

SUMMARY OF ARGUMENT ......................................................10

ARGUMENT .................................................................................12

I.    THE DISTRICT COURT ERRED IN DETERMINING THE
    CLAIMS PLED IN THIS SUIT ARE SUBJECT TO THE
    IDEA'S EXHAUSTION REQUIREMENT WHEN THE
    GRAVAMENOF THE COMPLAINT IS INTENTIONAL
    DISABILITY DISCRIMINATION AND NOT PLAINTIFF'S
    RIGHT TO A FAPE ..................................................................12

II.   THE DISTRICT COURT ERRED IN DETERMINING
    PLAINTIFF'S CLAIMS WERE SUBJECT TO THE IDEA'S
    EXHAUSTION REQUIREMENT WHEN EXHAUSTION WOULD
    BE FUTILE AND INADEQUATE AND A DUE PROCESS
    HEARING OFFICER COULD NOT GRANT THE RELIEF
    PLAINTIFF SEEKS. ...............................................................28

CONCLUSION......................................................................................32

CERTIFICATE OF COMPLIANCE......................................................33

CERTIFICATE OF BAR MEMBERSHIP..............................................34

CERTIFICATE OF SERVICE................................................................35

# TABLE OF AUTHORITIES

**Cases**

*Ahearn v. East Stroudsburg School District*, No. 3:19-868, 2020 WL 754337 (M.D. Pa. Feb. 13, 2020)........................................................24, 25

*Batchelor v. Rose Tree Media Sch. Dist.*, 759 F.3d 266 (3d Cir. 2014) .............29

*Booth v. Churner*, 206 F.3d 289, 293 n.3, *aff'd* 532 U.S. 731 (2001) ................1

*Constitution Party of Pennsylvania v. Aichele*, 757 F.3d 347, 357 (3d Cir. 2014) ...................................................................................2

*Davis v. Wells Fargo U.S.*, 824 F.3d 333, 346 (3d Cir. 2016) ..............................2

*D.E. v. Cent. Dauphin Sch. Dist.*, 765 F.3d 260, 275 (3d Cir. 2014) .................27, 28

*D.S. v. Bayonne Bd. of Educ.*, 602 F.3d 553, 557 (3d Cir. 2010) .........................17

*Endrew F. ex rel. Joseph F. v. Douglas Cty. Sch. Dist. RE-1*, ___ U.S. ___, 137 S.Ct. 988 (2017)..................................................13

*Fry v. Napoleon Community Schools*, ___ U.S. ___, 137 S.Ct. 743 (2017) *passim*

*Goldman v. Citigroup Global Markets, Inc.*, 834 F.3d 242 (3d Cir. 2016) .......2

*J.L. v. Wyoming Valley West School District*, No. 3:15-1750, 2016 WL 4502451 (M.D. Pa. Aug. 29, 2016), *aff'd,* 722 Fed. App'x 190 (3d Cir. 2018) ................................................................................24,25, 30,31

*J.S. v. Houston County Board of Education*, 877 F.3d 979 (11th Cir. 2017) ................................................................................26,27

*Kaiser Aluminum*, 456 F.3d 328, 330 (3d Cir. 2006).................................30

*K.M. ex rel. D.G. v. Hyde Park Cent. Sch. Dist.*, 381 F.Supp.2d 343, 360
(S.D.N.Y. 2005) ................................................................................................27

*Olmstead v. L.C. ex rel. Zimring*, 527 U.S. 581, 119 S.Ct. 2176, 144 L.Ed.2d
540 (1999) ..................................................................................................27,28

*School District of Philadelphia*, 115 LRP 2743 (PSEA, No. 14498/13-14 AS,
filed Dec. 17, 2014) .........................................................................................29

*Sellers v. School Board of City of Manassas, Virginia*, 141 F.3d 524,
529 (4th Cir. 1998) ...........................................................................................28

*S.H. v. State-Operated Sch. Dist. of Newark*, 336 F.3d 260, 264
(3d Cir. 2003) ...................................................................................................22

*Walter D. Palmer Leadership Learning Partners Charter School*,
117 LRP 21589 (PSEA, Nos. 15959-1415AS, 15960-1415AS,
filed Mar. 31, 2017) ..........................................................................................29

*Wellman v. Butler Area School*, 877 F.3d 125 (3d Cir. 2017) .................*passim*

**Statutes and Court Rules**

20 U.S.C. § 1400 *et seq.* ...................................................................................10

20 U.S.C. § 1412(a)(1)(A) .................................................................................13

20 U.S.C. §1414(d)(1)(A)(i)(IV) ......................................................................25

20 U.S.C. 1414(d)(1)(A)(iii))) ...........................................................................22

20 U.S.C. §1415(f) .............................................................................................13

20 U.S.C. §1415(g) ............................................................................................13

20 U.S.C. §1415 (l) ............................................................................................13

28 U.S.C. §1291 ...................................................................................................1

28 U.S.C. §1331 ...................................................................................................1

29 U.S.C. §794 .................................................................................... 1,5

42 U.S.C. §1983 ............................................................................. 1,8,20

Fed. R. App. P. 4(a)(1)(A) .................................................................. 1

## STATEMENT OF JURISDICTION

The United States District Court for the Middle District of Pennsylvania had federal question subject matter jurisdiction pursuant to 28 U.S.C. §1331. The issues before the District Court involved the interpretation of the federal anti-discrimination statute found at Section 504 of the Rehabilitation Act, 29 U.S.C. §794. The issues also involved the Crestwood School District's violation of Minor Plaintiff, F.S.' right to equal protection under the Fourteenth Amendment, as made actionable under 42 U.S.C. §1983.

This Court has appellate jurisdiction to hear F.S.' appeal pursuant to 28 U.S.C. §1291, as Appellant's appeal is from a final Order of the Honorable Malachy E. Mannion disposing of all claims between all parties. *See Booth v. Churner*, 206 F.3d 289, 293 n.3, *aff'd* 532 U.S. 731 (2001). The final Order appealed from was entered on November 3, 2020. F.S.' Notice of Appeal was timely filed on November 12, 2020, pursuant to Fed. R. App. P. 4(a)(1)(A) as it was filed within 30 days of November 3, 2020.

## STANDARD OF REVIEW

A District Court's grant of a motion to dismiss is subject to plenary review by this Court. *Goldman v. Citigroup Global Markets, Inc.*, 834 F.3d 242 (3d Cir. 2016).

An attack on the Court's jurisdiction may be either "facial" or "factual" and the "distinction determines how the pleading must be reviewed." *Constitution Party of Pennsylvania v. Aichele*, 757 F.3d 347, 357 (3d Cir. 2014). A facial attack tests the sufficiency of the pleadings, while a factual attack challenges whether a plaintiff's claims fail to comport factually with jurisdictional prerequisites. *Id.* An attack on jurisdiction based on a failure to exhaust remedies that is filed prior to answering the complaint is usually, "by definition, a facial attack" on the pleadings unless the defendant has offered factual averments in support of its motion. *Id.*

Here, defendants raise a facial challenge to this court's subject matter jurisdiction because they have not yet filed their answer to the complaint, and they do not offer competing facts. Under these circumstances, the Court must accept the complaint's allegations as true. *Davis v. Wells Fargo U.S.*, 824 F.3d 333, 346 (3d Cir. 2016).

**STATEMENT OF RELATED CASES OR PROCEEDINGS**

This case has not previously been before the United States Court of Appeals for the Third Circuit. F.S. is unaware of any other related case of proceeding completed, pending, or about to be presented to this Court.

## STATEMENT OF ISSUES

**I.    WHETHER THE DISTRICT COURT ERRED IN DETERMINING THE CLAIMS PLED IN PLAINTIFF'S COMPLAINT ARE SUBJECT TO THE IDEA'S EXHAUSTION REQUIREMENT WHEN THE GRAVAMEN OF PLAINTIFF'S COMPLAINT IS INTENTIONAL DISCRIMINATION ON THE BASIS OF DISABILITY AND NOT PLAINTIFF'S RIGHT TO A FAPE.**

*Suggested Answer in the affirmative.*

**II.    WHETHER THE DISTRICT COURT ERRED IN DETERMINING PLAINTIFF'S CLAIMS WERE SUBJECT TO THE IDEA'S EXHAUSTION REQUIREMENT WHEN EXHAUSTION WOULD BE FUTILE AND INADEQUATE AND A DUE PROCESS HEARING OFFICER COULD NOT AWARD THE RELIEF PLAINTIFF SEEKS.**

*Suggested Answer in the affirmative.*

## STATEMENT OF THE CASE

### A.    Factual History

This case arises from violations of Minor Plaintiff F.S.' ("F.S.") rights under Section 504 of the Rehabilitation Act, 29 U.S.C. §794 ("Section 504") and the Equal Protection Clause set forth in the Fourteenth Amendment to the United States Constitution by Defendants, Crestwood School District ("School District") and its Head Cheerleading Coach, Kerri Fey ("Coach Fey").  F.S. brings this suit through her parent and legal guardian, Pamela Scarano ("Mother").

F.S. is a student who attended Crestwood Middle School ("School") in Mountain Top, Pennsylvania.  The School District lies in the Pocono Mountains of Pennsylvania and is comprised of several schools, including Crestwood Middle School.  Coach Fey is, and at all relevant times was, the School District's head cheerleading coach.

F.S. suffers from multiple, serious physical and developmental disabilities. She is primarily bound to a wheelchair and is non-verbal.  Mother registered F.S. for the School District's cheerleading program in the fall of 2017.  Mother expended approximately three hundred dollars ($300.00) to purchase uniforms and a backpack for F.S. to enable F.S. to participate in the cheerleading program. The School District's cheerleading program was non-selective.  In other words, no "cuts" were made to the group of students wishing to participate in the program. Thus, any student who wished to participate in the School District's cheerleading program was eligible to do so.

Despite F.S.'s physical and developmental disabilities, and despite the School District's repeated promises, the School District refused to make any reasonable accommodations to allow F.S. to participate in the School District's cheerleading program. Further, although the School District promised to create a liaison and to develop directives to cheerleading coaches, as well as the School's Athletic Director, it never did so. Additionally, the School District's cheerleading team refused to make any accommodation to allow F.S. to participate in team photographs, which were later publicly displayed. To the contrary, the School District's cheerleading team, through Coach Fey, arranged for the team photographs to take place on top of a large hill, rendering it exceedingly difficult for F.S. to join the team in her wheelchair. Additionally, Mother was required to contact the photographer separately to arrange for F.S. to participate in cheerleading photographs.

Further, the School District's cheerleading team did not order cheerleading uniforms for F.S. when it ordered uniforms for the remainder of the team. Rather, Mother was forced to contact the vendor herself and order F.S.'s uniforms separately.

In addition, on or about September 30, 2017, after the School District's Homecoming Parade, the School District's cheerleading team again excluded Student from a team photograph. Further, at the homecoming game, F.S. was left behind a fence; there was no plan to place other cheerleaders with F.S. or to include F.S. at all in the cheerleading team's activities. Additionally, the School District's cheerleading team never asked F.S. to have her cheerleading uniform embroidered

with the team insignia "Crestwood Cheer" as it did for the other members of the team.

On or about October 1, 2017, based on the School District's persistent attempts to exclude F.S. from team cheerleading activities, and its refusal to provide any reasonable accommodation for F.S. to participate, F.S. was forced to cease participating in the School District's cheerleading program. Neither Mother nor F.S. received any contact from any coach inquiring why F.S. was not returning to the cheerleading program. Additionally, the School District's cheerleading program excluded at least one other participant on the basis of disability.

Further, the School District's Assistant Superintendent, Joseph Rasmus ("Rasmus"), informed Mother he would assist her in having F.S. participate in the School District's field hockey program. Specifically, Rasmus indicated the School District's field hockey coach would contact Mother; however, the coach never did so.

Mother sent several emails to the School District regarding the difficulties F.S. encountered with the cheerleading program. Mother also exchanged electronic communications with Coach Fey regarding the significant hardships F.S. experienced during her attempts to participate in the School District's cheerleading program. These exchanges identified all of the difficulties Mother and F.S. encountered with the School District's cheerleading program. However, none of those problems were appropriately addressed or resolved.

Ultimately, Mother registered F.S. to participate in a different school district's cheerleading program, Wyoming Valley West, which was very supportive of F.S. In fact, the Wyoming Valley West cheerleading program displayed pictures and articles that included F.S.

Through her Complaint, F.S. set forth two claims for relief.  First, F.S. averred the School District and Coach Fey's conduct in intentionally discriminating against F.S. on the basis of her physical and developmental disabilities by excluding F.S. from participating in the School District's non-selective cheerleading program violated Section 504.  Second, F.S. alleged the School District and Coach Fey violated Section 1983 of the Civil Rights Act, 42 U.S.C. §1983, by intentionally discriminating against F.S. on the basis of her disabilities in violation of the Equal Protection Clause of the 14th Amendment to the U.S. Constitution.

As to the relief sought, F.S. seeks: a declaration that the School District and Coach Fey, individually and in her official capacity, acted with bad faith, gross misjudgment and deliberate indifference and thereby intentionally discriminated against F.S. in violation of Section 504, Section 1983 of the Civil Rights Act and the Equal Protection Clause of the 14th Amendment; an award of compensatory damages; an award of punitive damages; and an award of attorney's fees and costs.

## B.    Procedural History

On September 16, 2019, F.S. filed a two-count complaint ("Complaint") against the School District and Coach Fey in the U.S. District Court for the Middle District of Pennsylvania. The School District and Coach Fey executed waivers of

service on September 25, 2019, which F.S. filed with the Court.  On November 18, 2019, the School District and Coach Fey filed a Motion to Dismiss Plaintiff's Complaint (Motion).  The School District and Coach Fey filed a brief in support of their Motion on December 2, 2019.  F.S. filed her Brief in Opposition to the Motion. The School District and Coach Fey filed a reply brief.

On November 3, 2020 the District Court issued an order granting the School District and Coach Fey's motion to dismiss, concluding the Court lacked subject matter jurisdiction over F.S.' claims.  The Honorable Malachy E. Mannion issued the memorandum opinion and order, dismissing both counts for failure to exhaust administrative remedies under the IDEA.  In *obiter dictum*, Judge Mannion stated F.S. did not plead sufficient facts to state a claim under Section 1983 for violation of her equal protection rights guaranteed under the 14th Amendment to the United States Constitution.

On November 12, 2020, F.S. filed a Notice of Appeal with the United States District Court for the Middle District of Pennsylvania.  On November 18, 2020, Plaintiffs filed a Concise Summary of the Case with the United States Court of Appeals for the Third Circuit.  F.S. now submits this Brief in support of her appeal.

## SUMMARY OF ARGUMENT

Contrary to the District Court's erroneous determination, F.S. was not required to exhaust administrative remedies under the Individuals with Disabilities in Education Act, 20 U.S.C. § 1400 *et seq.*, prior to commencing suit in the District Court based on the facts pled here.  Further, the District Court erred in reaching this determination at the earliest possible stage of the suit before the School District and Coach Fey filed an answer and without the opportunity for development of a factual record for the Court's review.

None of the claims alleged by F.S. relate to her right to special education services, her right to a Free and Appropriate Public Education ("FAPE"), or services and supports provided for in an individualized education plan.  Rather, the gravamen of F.S.' Complaint is intentional discrimination inflicted by the School District and its Coach Fey based on their intentional exclusion of F.S. from the School District's cheerleading program based solely on F.S.' disabilities.  Under the facts pled, exhaustion of administrative remedies is not required pursuant to the standards set forth by the United States Supreme Court's seminal decision in *Fry v. Napoleon Community Schools*, ___ U.S. ___, 137 S.Ct. 743 (2017).

To that end, the gravamen of F.S.' Complaint is intentional disability discrimination by the School District and its Coach Fey through their exclusion of F.S. from their Cheerleading Program violation of federal law.  The School District and its Head Cheerleading Coach excluded F.S. from participation in its federally-funded, non-selective program by, among other things: (1) acknowledging several concerns raised by Mother relating to F.S.' participation in the cheerleading program

and failing to take any action to provide F.S. reasonable accommodations to allow her participation; (2) excluding F.S. from its cheerleading uniform and embroidery orders; (3) excluding F.S. from publicly displayed team photographs; and (4) excluding F.S. from participation in homecoming events and team activities. The District Court erred in holding as a matter of law that F.S.' claims of intentional disability discrimination required exhaustion of administrative remedies under the IDEA prior to her filing suit in federal court.

To that end, the District Court's reliance on this Court's decision in *Wellman v. Butler Area School*, 877 F.3d 125 (3d Cir. 2017), and two subsequent unreported District Court opinions is misplaced as this case is readily distinguishable from those cases. Additionally, the District Court's reliance on an IDEA provision that merely sets forth the definition of an Individualized Education Plan ("IEP") for the proposition that an IEP is required, as a matter of law, to provide for F.S.'s participation in the School District's Cheerleading Program, is equally misplaced as such a determination is not supported by the record in this matter, which consists solely of F.S.' Complaint.

In addition, exhaustion of administrative remedies would be futile and inadequate because a special education due process hearing officer lacks jurisdiction over F.S.' claims for monetary relief in the form of compensatory and punitive damages. Therefore, even if exhaustion does apply, which it does not, the instant suit falls within exceptions to the exhaustion doctrine. The authority relied upon by the District Court in reaching a contrary result is inapposite.

# ARGUMENT

## I. THE DISTRICT COURT ERRED IN DETERMINING THE CLAIMS PLED IN PLAINTIFF'S COMPLAINT ARE SUBJECT TO THE IDEA'S EXHAUSTION REQUIREMENT WHEN THE GRAVAMEN OF PLAINTIFF'S COMPLAINT IS INTENTIONAL DISCRIMINATION ON THE BASIS OF DISABILITY AND NOT PLAINTIFF'S RIGHT TO A FAPE.

The District Court erred in determining this case was subject to the IDEA's exhaustion requirement on the ground that the gravamen of F.S.' Complaint concerned F.S.'s right to a FAPE, and that F.S.' injuries were caused by the School District and Coach Fey's failure to adhere to F.S.' IEP. To the contrary, this case relates solely to the intentional exclusion of F.S. by the School District and Coach Fey from the School District's non-selective cheerleading program on the basis of her disabilities. Contrary to the District Court's determination, F.S. was not required to exhaust administrative remedies based on the facts alleged in the Complaint.

More specifically, the facts, as pled, reflect that none of the allegations or claims set forth by F.S. relate to her right to special education services, her right to a FAPE, or services and supports provided for in an IEP. Rather, the gravamen of F.S.' Complaint is intentional disability discrimination. The District Court erred in reaching a contrary result.

Application of the United States Supreme Court decision in *Fry* supports this conclusion. In *Fry*, the Supreme Court explained that the IDEA ensures children with disabilities receive needed special education services. Under the IDEA, an IEP serves as the "primary vehicle" for providing each child with the promised FAPE. *Id.* at 749 (citations omitted). Most notably, the IEP documents the child's current

"levels of academic achievement," specifies "measurable annual goals" for how she can "make progress in the general education curriculum," and lists the "special education and related services" to be provided so that she can "advance appropriately toward [those] goals." *Id.* (citations omitted). Thus, a FAPE includes instruction specially designed to meet the unique needs of a child with a disability. *Endrew F. ex rel. Joseph F. v. Douglas Cty. Sch. Dist. RE-1*, ___ U.S. ___, 137 S.Ct. 988 (2017).

The IDEA requires participating states to provide disabled children with a FAPE, 20 U.S.C. § 1412(a)(1)(A), and sets forth an administrative mechanism for resolving disputes concerning whether a school has complied, 20 U.S.C. §1415. The IDEA provides for an impartial due process hearing conducted by the state or local educational agency, 20 U.S.C. §1415(f), and the right to appeal the results to the state educational agency if the due process hearing was conducted by the local educational agency, 20 U.S.C. §1415(g). The IDEA also requires parties to use these procedures whenever they seek relief "available under this subchapter" even if they are pursuing relief under other federal laws. 20 U.S.C. §1415 (l). Specifically, the IDEA provides:

> Nothing in this chapter shall be construed to restrict or limit the rights, procedures, and remedies available under the Constitution, the Americans with Disabilities Act of 1990, title V of the Rehabilitation Act of 1973, or other Federal laws protecting the rights of children with disabilities, except that before the filing of a civil action under such laws seeking relief that is also available under this subchapter, the procedures under subsections (f) and (g) shall be exhausted to the same extent as would be required had the action been brought under this subchapter.

20 U.S.C. §1415(l).  Thus, a plaintiff who seeks relief available under the IDEA must exhaust his administrative remedies before filing a lawsuit, even if he relies on laws other than the IDEA.

In *Fry*, the U.S. Supreme Court examined the interplay between the IDEA's exhaustion provision and federal anti-discrimination statutes.  There, the plaintiffs' daughter, E.F., suffered from cerebral palsy; E.F.'s pediatrician recommended she be given a service dog to assist her with everyday tasks.  E.F.'s school, which provided her a human aide as part of her IEP, refused to permit her to bring the service dog to school.  The plaintiffs sued the school district and its principal.  They alleged the defendants violated the Americans with Disabilities Act ("ADA") and Section 504 by "denying [E.F.] equal access" to the school and its programs, "refus[ing] to reasonably accommodate" E.F.'s use of a service animal, and otherwise "discriminat[ing] against [E.F.] as a person with disabilities."  *Fry*, 137 S.Ct. at 752 (record citations omitted).

The district court in *Fry* granted the defendants' motion to dismiss holding, because the claims related to E.F.'s education and implicated E.F.'s IEP, the IDEA's exhaustion provision required the plaintiffs to exhaust the IDEA's administrative procedures before filing suit under the ADA and Section 504.  A divided panel of the Circuit Court affirmed.

On further appeal, however, the Supreme Court vacated and remanded, explaining (with emphasis added):

> *[Section] 1415(l) [of the IDEA's] exhaustion rule hinges*
> *on whether a lawsuit seeks relief for the denial of [FAPE].*

14

> If a lawsuit charges such a denial, the plaintiff cannot escape § 1415(l) merely by bringing her suit under a statute other than the IDEA. … Rather, that plaintiff must first submit her case to an IDEA hearing officer, experienced in addressing exactly the issues she raises. *But if, in a suit brought under a different statute, the remedy sought is not for the denial of a FAPE, then exhaustion of the IDEA's procedures is not required.*

*Id.* at 754.  Further, the Supreme Court espoused the following guidance in analyzing whether a plaintiff's complaint seeks relief for denial of a FAPE (with emphasis added):

> What matters is the crux—or, in legal-speak, the gravamen—of the plaintiff's complaint, setting aside any attempts at artful pleading. …. [T]hat examination should consider substance, not surface. … Section 1415(l) is not merely a pleading hurdle.  It requires exhaustion when the gravamen of a complaint seeks redress for a school's failure to provide a FAPE, even if not phrased or framed in precisely that way.

> In addressing whether a complaint fits that description, a court should attend to the diverse means and ends of the statutes covering persons with disabilities—the IDEA on the one hand, the ADA and Rehabilitation Act (most notably) on the other.  The IDEA, of course, protects only 'children' (well, really, adolescents too) and concerns only their schooling.  And … the statute's goal is to provide each child with meaningful access to education by offering individualized instruction and related services appropriate to her 'unique needs.'  By contrast, Title II of the ADA and § 504 of the Rehabilitation Act cover people with disabilities of all ages, and do so both inside and outside schools. And those statutes aim to root out disability-based discrimination, enabling each covered person (sometimes by means of reasonable accommodations) to participate equally to all others in public facilities and federally funded programs.  In short, the IDEA guarantees individually tailored educational services, while Title II and § 504 promise non-

15

discriminatory access to public institutions. That is not to deny some overlap in coverage: The same conduct might violate all three statutes … which is why … a plaintiff might seek relief for the denial of a FAPE under Title II and § 504 as well as the IDEA. *But still, the statutory differences just discussed mean that a complaint brought under Title II and [Section] 504 might instead seek relief for simple discrimination, irrespective of the IDEA's FAPE obligation.*

One clue to whether the gravamen of a complaint against a school concerns the denial of a FAPE, or instead addresses disability-based discrimination, can come from asking a pair of hypothetical questions. First, could the plaintiff have brought essentially the same claim if the alleged conduct had occurred at a public facility that was not a school—say, a public theater or library?  And second, could an adult at the school—say, an employee or visitor—have pressed essentially the same grievance? *When the answer to those questions is yes, a complaint that does not expressly allege the denial of a FAPE is also unlikely to be truly about that subject; after all, in those other situations there is no FAPE obligation and yet the same basic suit could go forward.*  But when the answer is no, then the complaint probably does concern a FAPE, even if it does not explicitly say so; for the FAPE requirement is all that explains why only a child in the school setting (not an adult in that setting or a child in some other) has a viable claim. …

Id. at 755-56 (internal citations omitted).

In addition, the *Fry* Court explained, a further sign that the gravamen of a suit is the denial of a FAPE can emerge from the history of the proceedings.  In particular, a court may consider whether a plaintiff previously invoked the IDEA's formal procedures to handle the dispute—thus starting to exhaust the IDEA's remedies before switching midstream.  "[P]rior pursuit of the IDEA's administrative remedies

will often provide strong evidence that the substance of a plaintiff's claim concerns the denial of a FAPE, even if the complaint never explicitly uses that term." *Id.* at 757.

Here, the gravamen of F.S.' complaint—intentional discrimination against a disabled individual's participation in a cheerleading program—is separate and apart from issues relating to F.S.'s special education services, is not necessary for F.S. to receive a FAPE, and is unrelated to F.S.'s IEP, the "centerpiece" of the IDEA's system for delivering education to disabled children. *D.S. v. Bayonne Bd. of Educ.*, 602 F.3d 553, 557 (3d Cir. 2010).

To that end, participation in the School District's non-selective cheerleading program is not required for F.S. to receive educational benefits at school, and nothing in the Complaint alleges participation in the cheerleading program is required for F.S. to receive special education services. *See Fry*, 137 S.Ct. at 758 ("The Frys' complaint alleges only disability-based discrimination, without making any reference to the adequacy of the special education services E.F.'s school provided.").

Simply stated, the gravamen of the Complaint does not concern the alleged denial of a FAPE or raise a single allegation regarding the propriety of the development or implementation of an IEP. Indeed, the Complaint makes no reference to the adequacy of the special educational services provided by the School District. Rather, the gravamen of the Complaint is simple discrimination.

In addition, as to the hypothetical questions espoused by the *Fry* Court, both questions are properly answered in the affirmative here.  First, Plaintiff could have brought the same claim if the alleged discriminatory conduct occurred at a public facility other than a school, *i.e.*, through a city or township program that offered a non-selective cheerleading program.  In addition, an adult at the school, *i.e.*, a wheelchair-bound employee who wished to serve as a coach, but was excluded from doing so based on intentional discrimination arising from that individual's disability, could press the same grievance.  Thus, similar to *Fry*, this Court should vacate the District Court's Order and remand for further proceedings.

Additional support for the conclusion that exhaustion in not required here is found in the history of the proceedings.  Specifically, F.S. did not previously invoke the IDEA's formal procedures to handle the dispute, thereby starting to exhaust the IDEA's remedies before switching channels midstream.  The absence of Plaintiff's prior pursuit of the IDEA's administrative remedies bolsters the determination that Plaintiff's claim does not concern denial of a FAPE.  Thus, a proper application of the principles set forth in *Fry* to the averments and claims set forth in F.S.' Complaint, reveals that the District Court erred in determining exhaustion was required in this matter.

Moreover, this is not a case like *Wellman v. Butler Area School District*, 877 F.3d 125 (3d Cir. 2017), the only binding Third Circuit precedent upon which the District Court relied in dismissing F.S.' Complaint.   There, the plaintiff, a high school student, suffered a head injury while playing flag football in his physical education class.  After school that day, the student attended football practice, where

he suffered additional head injuries.  The next day, the student saw his doctor and later underwent a CT scan, which revealed he sustained a concussion.  The student suffered pain and experienced staring spells, trouble sleeping, and difficulty concentrating.  The student returned to school, but his mother asked the school to assist him until his concussion healed.  The student's mother requested the student be taken out of his German and physical education classes, be given extra study halls, and that the football coach not allow him to engage in any unsuitable physical activity.  Rather than allow him to rest during his extra study halls, however, the teachers required the student to take make-up exams.  The student alleged the school's indifference to his need for accommodations increased his stress and aggravated his cognitive problems.  Further, the student's physician wrote a letter asking the school to provide the student academic accommodations, specifically tutors and more time to complete his assignments.  The school ignored these requests.

A few weeks later, the student attended a high school football game.  Before the game, the student's mother told the football coach the student had a concussion, was not cleared to participate, and should not be exposed to any possibility of physical contact.  Nevertheless, the football coach asked the student to hold one of the markers on the sidelines.  The student was not wearing any protective gear. During the game, a player in full uniform ran into the student and knocked him over, causing another head injury.  After this incident, the student's concussion symptoms worsened, and he experienced severe headaches, problems focusing, and exhaustion. A CT scan revealed the student had post-concussive syndrome.  The student began to miss school because of his symptoms and medical appointments, and when he

was able to attend school, his teachers refused to provide accommodations for him. As a result, the student suffered significant stress, embarrassment, and anxiety. Because the school district would not accommodate him, the student requested and received homebound instruction but claimed the teachers who provided the instruction were generally apathetic.

The student attempted to return to school, but again his teachers denied his requests for accommodations, and he returned to homebound instruction for the remainder of the school year. The student attempted to return to school the following year but was overwhelmed by severe anxiety. The school refused to design and implement an IEP for the student, and it subsequently proposed a Section 504 Plan, which the parties could not agree upon. The student later transferred to a private school.

Thereafter, the student and his parents filed a due process complaint, requesting an IEP, compensatory education, and tuition reimbursement. The parties then entered into a settlement and release agreement as to the claims in the due process case, which related to the student's right to a FAPE.

The student then filed suit against the School District and the high school's principal alleging claims under Section 504 and the ADA based on their failure to accommodate the student and treating him as if his injuries were fabricated or exaggerated. The student also sought relief under 42 U.S.C. §1983 for a violation of the student's equal protection rights by failing to accommodate him, retaliating against him because he requested accommodations, and treating him differently

from other disabled students.  The School District and the principal filed a motion to dismiss, which the district court granted on the ground it lacked subject matter jurisdiction because the student did not exhaust his administrative remedies under the IDEA.

On the student's appeal, this Court affirmed.  This Court agreed with the district court that the allegations and claims raised in the student's complaint were subject to the IDEA's exhaustion requirement, explaining:

> Application of the *Fry* framework to [the student's] entire complaint and each of his claims shows that his grievances all stem from the alleged failure to accommodate his condition and fulfill his educational needs.  A review of his detailed factual allegations shows that the conduct about which he complains would not have occurred outside the school setting and that a nonstudent could not (and would not) have 'pressed essentially the same grievance.'  *Fry*, 137 S.Ct. at 756.  Most of the more than thirty paragraphs within the section of the complaint entitled "Statement of Facts" set forth [the student's] requests for specific accommodations to help him achieve the level of learning expected from him, such as removing him from his German and physical education classes, providing him with extra study halls, tutors, and additional time to complete assignments, and conveying to the teachers and football coach that he not engage in any unsuitable activity that might aggravate his symptoms and condition.  [The student] alleges that, rather than being provided with these accommodations, he was taken out of study hall so he could take exams, given too much work and denied extra time to complete it, had apathetic homebound instructors, and was not given support to address the impact of his concussive condition on his ability to learn.
>
> These factual allegations are expressly incorporated by reference into each count of the complaint, and each count includes additional allegations.  In Count I, which seeks relief under the ADA and Rehabilitation Act, [the student] reiterates the allegation that the school did not make accommodations for

his educational and physical activities while at school and he specifically asserts that '[t]he failure to provide accommodations made [his] inability to survive in the school inevitable' and that he was 'effectively excluded from school.' App. 138, 39. In short, in this count, he complains about the educational experience that he had while in the [s]chool [d]istrict. This is not the sort of claim that would be brought by a nonstudent against a non-school facility. Thus, under *Fry*, this claim seeks relief under the IDEA and is subject to exhaustion.

Count II is also subject to exhaustion. Count II seeks relief under the ADA and Rehabilitation Act due to the school's alleged failure to ensure that [the student] was not exposed to danger after the initial head injury he sustained during physical education class but was still permitted to participate in school activities. In this regard, the complaint alleges that [the student's] mother asked that [the student] be given the accommodations of not being required to 'suit[ ] up or [be] exposed to danger of playing conditions, but was still allowed to attend the [football] game.' App. 140. Thus, football was an extracurricular school activity that [the student's] mother wanted him to experience safely. *While there could be a scenario in which these events may not relate to a FAPE*, as pleaded, it appears that the failure to ensure that [the student] was not placed in a dangerous situation at an extracurricular activity was offered as another example of how the school failed to accommodate him so that he could benefit from his educational experience. … Because these factual allegations are intertwined with his complaints about the school's failure to accommodate his educational needs, which include his participation in extracurricular activities, *see S.H. v. State-Operated Sch. Dist. of Newark*, 336 F.3d 260, 264 (3d Cir. 2003) (observing that an IEP "must detail those special education services [that] ... allow the child to progress in both the general curriculum and participate in extracurricular activities ..." (citing 20 U.S.C. 1414(d)(1)(A)(iii))), and because such allegations could not be brought by a nonstudent or outside the school setting, the claim set forth in Count II seeks relief for failing to provide a FAPE and is subject to exhaustion.

Count III, which alleges a claim under § 1983, also seeks relief for failing to provide a FAPE. It incorporates all of the factual allegations within the complaint and further asserts that

the School District's special education department refused to provide [the student] services, and that the school treated him differently because his claim for such services was based upon the concussions he sustained during school activities, which the principal did not view as a disabling condition. Again, his grievance is that he was unable to access educational services, which is something only a student at school can seek. Thus, this is not a claim that could have been brought outside a school setting or by a nonstudent and, as a result, it is a claim that also seeks relief for failing to provide a FAPE and is subject to exhaustion.

> In summary, both the entire pleading and each individual count show that [the student] seeks relief because the School District failed to provide him with academic accommodations that would have allowed him to succeed and remain enrolled in the school despite his injury. These allegations concern the denial of a FAPE, see Fry, 137 S.Ct. at 753-54 (explaining that the FAPE requirement entitles a child to 'meaningful access to education based on her individual needs' (citation and internal quotation marks omitted)), and foreclose the conclusion that [the student] could have brought the same complaint against another public facility or that an adult at the school could have brought the same complaint.

*Id.* at 135.

Unlike *Wellman*, this case relates solely to disability discrimination through the systematic exclusion of F.S. from the cheerleading program. The instant Complaint does not mention or relate to F.S.'s right to a FAPE, F.S.' academic accommodations, or the provision of special education services pursuant an IEP. Thus, unlike in *Wellman*, the Complaint's allegations, which focus solely on intentional discrimination and exclusion from the School District's cheerleading program are in no way intertwined with any averments relating to academic accommodations for F.S. Further, the *scenario* this Court spoke of in the above-

quoted excerpt of *Wellman*, involving a complaint that in no way relates to a FAPE is now before this Court.  Additionally, the Complaint here does not seek relief that could be awarded by a special education due process hearing officer.  These significant distinctions between this case and *Wellman* lead to a different result, *i.e.*, that exhaustion under the IDEA is not required here.

Thus, contrary to the District Court's determinations, F.S. was not required to exhaust administrative remedies prior to filing the instant suit because the gravamen of Plaintiff's complaint is not the denial of a FAPE.  Rather, the gravamen of Plaintiff's complaint is intentional discrimination against a disabled individual on the basis of the individual's disability.

In addition, the two unreported District Court decisions cited by the District Court in its memorandum opinion here do not support the result reached by the District Court here.  More particularly, in *Ahearn v. East Stroudsburg School District*, No. 3:19-868, 2020 WL 754337 (M.D. Pa. Feb. 13, 2020) and *J.L. v. Wyoming Valley West School District*, No. 3:15-1750, 2016 WL 4502451 (M.D. Pa. Aug. 29, 2016), *aff'd,* 722 Fed. App'x 190 (3d Cir. 2018), the Middle District Court held the gravamen of the plaintiffs' claims concerned denial of FAPE and required exhaustion of administrative remedies where their claims arose from the use of physical restraints and handcuffs in school and failing to adhere to the student's staff action for emergency ("SAFE") plan which the plaintiffs alleged amounted to a denial of FAPE by virtue of a regression in the student's learning, *Ahearn*, or the use of restraints while a student traveled on school transportation, which the plaintiffs' alleged was a service specifically provided for in the student's IEP, resulting in a

deprivation of the student's educational rights.  *J.L.*  While the connection between the acts alleged acts in those cases and the alleged denial of a FAPE were readily apparent in *Ahearn* and *J.L.*, the same is not true here where the crux of F.S.' Complaint relates solely to intentional discrimination.  Thus, the District Court erred in relying on those cases here.

Finally, in support of its decision here, the District Court stated, "exclusion from full participation in an extracurricular school activity can indeed—and in this case does—constitute an IDEA claim since the IDEA mandates that IEPs include provisions for disabled students to participate in "extracurricular and other nonacademic activities."  *See* 20 U.S.C. §1414(d)(1)(A)(i)(IV).  Again, the District Court's decision is in error.

More particularly, despite pointing to the definition of an IEP and noting an IEP *can* include provisions for extracurricular activities and, therefore, fall within the ambit of the IDEA, the District Court here went a step further and decided, as a matter of law, such a claim "does" constitute an IDEA claim without any facts to support its conclusion.  To that end, the IDEA provision cited by the District Court does not support its conclusion.  Specifically, the provision cited by the District Court, 20 U.S.C. §1414(d)(1)(A)(i)(IV), states:

> The term "individualized education program" or "IEP" means a written statement for each child with a disability that is developed, reviewed, and revised in accordance with this section and that includes … a statement of the special education and related services and supplementary aids and services, based on peer-reviewed research to the extent practicable, to be provided to the child, or on behalf of the child, and a statement of the

program modifications or supports for school personnel
that will be provided for the child—

[1] to advance appropriately toward attaining the
annual goals;
[2] to be involved in and make progress in the
general education curriculum in accordance with
subclause (I) and to participate in extracurricular and other
nonacademic activities; and
[3] to be educated and participate with other
children with disabilities and nondisabled children in the
activities described in this subparagraph[.]

Contrary to the District Court's determination, the plain language of this
statutory provision, which defines an IEP, does not *require* an IEP include provisions
for extracurricular activities, and determining that issue here as a matter of law,
where no factual basis existed upon which to make such a determination, was
improper.

If the District Court's decision is permitted to stand in this case, there would
be no set of facts under which exhaustion would not be required if the matter relates,
*in any way*, to a school.  Clearly, this could not have been the intent of Congress in
enacting the IDEA or the Supreme Court in *Fry*, a case which involved a student's
claims against her school district, where the Court declined to find exhaustion was
required under the facts presented, but rather vacated the grant of a motion to dismiss
and remanded for further proceedings, the same result F.S. seeks here.

In addition, in *J.S. v. Houston County Board of Education*, 877 F.3d 979 (11th
Cir. 2017)*, a case this Court cited approvingly in *Wellman*, which concerned the
exclusion and isolation of a student from his peers on account of his disability, the
Eleventh Circuit Court observed:

The cause of action here does not fit neatly into *Fry's* hypotheticals. The complaint here specifically alleges that the School Board 'allowed J.S. to be removed from his regular classroom, based on discriminatory reasons and for no purpose related to his education.' Compl., D.E. 1 at 46. Unlike the examples in *Fry*, here we cannot as easily divorce J.S.' claim of isolation from the context of him being an elementary student at a school. Although this claim could be brought as a FAPE violation for failure to follow J.S.' IEP, we conclude that it is also cognizable as a separate claim for intentional discrimination under the ADA and § 504.

In *Olmstead v. L.C. ex rel. Zimring*, 527 U.S. 581, 119 S.Ct. 2176, 144 L.Ed.2d 540 (1999), the Supreme Court concluded that unjustified institutional isolation of persons with disabilities is a form of discrimination based on disability under Title II [of the ADA]. *See id.* at 599–600, 119 S.Ct. 2176. The Court considered two important factors in coming to this conclusion: one, that 'institutional placement of persons who can handle and benefit from community settings perpetuates unwarranted assumptions that persons so isolated are incapable or unworthy of participating in community life'; and, two, that 'confinement in an institution severely diminishes the everyday life activities of individuals.' *Id.* at 600–01, 119 S.Ct. 2176.

Isolation via institutionalization is admittedly a more extreme and restrictive action than removal from a school classroom, but the reasoning in *Olmstead* seems to apply here. J.S. has alleged—and has provided evidence tending to show—that he was, with some frequency, excluded and isolated from his classroom and peers on the basis of his disability. Although the circumstances alleged here do involve a violation of J.S.' IEP, they also implicate those further, intangible consequences of discrimination contemplated in *Olmstead* that could result from isolation, such as stigmatization and deprivation of opportunities for enriching interaction with fellow students. These injuries reach beyond a misdiagnosis or failure to provide appropriate remedial coursework. *Compare K.M. ex rel.*

> *D.G. v. Hyde Park Cent. Sch. Dist.*, 381 F.Supp.2d 343,
> 360 (S.D.N.Y. 2005) (recognizing that "unnecessary
> social isolation has been considered a form of actionable
> discrimination" and concluding that, in light of Olmstead,
> a disabled student's isolation during lunch appears to be
> such a claim), *with Sellers* [*v. School Board of City of
> Manassas, Virginia*, 141 F.3d 524, 529 (4th Cir. 1998)
> (concluding that allegations that a school board failed to
> recognize a student's disability based on test scores were
> insufficient to state a claim under § 504). Accordingly, the
> district court erred in analyzing this claim as merely a
> FAPE violation under the IDEA.

*Id.* at 986-87.

Here, based on the facts pled in the Complaint, F.S. has showed she was, with frequency, excluded and isolated from the School District's non-selective Cheerleading Program and her non-disabled peers on the basis of her disability. Under these circumstances, the District Court erred in holding, as a matter of law and without any opportunity for development of a factual record for the Court's review, that F.S.' claims were subject to exhaustion under the IDEA. Therefore, F.S. respectfully requests this Court reverse the decision of the District Court and remand this matter to the District Court for further proceedings.

## II.    THE DISTRICT COURT ERRED IN DETERMINING PLAINTIFF'S CLAIMS WERE SUBJECT TO THE IDEA'S EXHAUSTION REQUIREMENT WHEN EXHAUSTION WOULD BE FUTILE AND INADEQUATE AND A DUE PROCESS HEARING OFFICER COULD NOT GRANT THE RELIEF PLAINTIFF SEEKS.

In any event, even if exhaustion were applicable here (which it is not), the Third Circuit recognizes four exceptions to the exhaustion requirement: "(1) exhaustion would be futile or inadequate; (2) the issue presented is a purely legal

question; (3) the administrative agency cannot grant relief; and (4) exhaustion would cause severe or irreparable harm." *D.E. v. Cent. Dauphin Sch. Dist.*, 765 F.3d 260, 275 (3d Cir. 2014) (citation omitted). Circumstances that warrant application of the futility exception include those in which the IDEA cannot provide a suitable remedy for the harms alleged. *Batchelor v. Rose Tree Media Sch. Dist.*, 759 F.3d 266 (3d Cir. 2014).

Here, exceptions to exhaustion exists as imposition of an exhaustion requirement would be futile in light of the fact that the administrative agency cannot not grant the relief sought. More particularly, through the Complaint, F.S. seeks monetary and punitive damages, forms of relief that cannot be afforded by a special education due process hearing officer. As a result, even if exhaustion applied here –which it does not—the instant case falls squarely within two of the exceptions to exhaustion, futility and inadequacy of exhaustion and an inability of the administrative tribunal to grant the relief sought.

Indeed, if F.S. pursued her claims before a special education due process hearing officer here, the only remedy a hearing officer could award to address F.S.' intentional disability discrimination claims would be a declaration that the School District and Fey violated Section 504. If F.S. succeeded in this regard, she would then be required to file suit in the District Court in order to pursue her claims for compensatory and punitive damages arising out of the same violations, relief which the hearing officer lacks jurisdiction to award. *See In re Walter D. Palmer Leadership Learning Partners Charter School*, 117 LRP 21589 (PSEA, Nos. 15959-1415AS, 15960-1415AS, filed Mar. 31, 2017) (recognizing that hearing officer lacks

authority to grant monetary relief); *In re School District of Philadelphia*, 115 LRP 2743 (PSEA, No. 14498/13-14 AS, filed Dec. 17, 2014) (stating it is clear that hearing officers do not have the authority to award compensatory money damages for Section 504 issues.). Thus, requiring exhaustion as mandated by the District Court's decision here would have the effect of compelling F.S. to litigate the issues raised in her Complaint in two forums: (1) before a special education due process hearing officer, who could not grant the monetary relief F.S. seeks; and (2) before this Court in order to obtain the relief sought through her Complaint. In enacting the IDEA's exhaustion provision, Congress could not have intended such a result as it would be absurd and unreasonable; a result that this Court should avoid. *See In re Kaiser Aluminum*, 456 F.3d 328, 330 (3d Cir. 2006) (recognizing that "[a] basic principle of statutory construction is that we should avoid a statutory interpretation that leads to absurd results."). Moreover, such a result, which would effectively require F.S. to litigate her claims in two forums, is inconsistent with principles of judicial economy. Thus, exhaustion cannot be required based on the facts presented here, *i.e.*, where a plaintiff seeks relief in the form of compensatory and punitive damages based solely on intentional disability discrimination, which is in no way connected to her right to a FAPE under the IDEA.

Further, this case is distinguishable from *J.L.*, relied upon by the District Court for the proposition that the futility exception to exhaustion did not apply here. There, this Court stated: "What matters is the crux ... of the plaintiff's complaint, setting aside any attempts at artful pleading." *J.L.*, 722 Fed App'x at 195 *(quoting Fry*, 137 S. Ct. at 755). The Court in *J.L.* explained the plaintiff's own allegations and claims dictated the conclusion that the denial of a FAPE was the crux of his suit, and he

could not negate that fact simply by omitting educational redress from his prayer for relief.

Here, unlike in *J.L.*, F.S.'s claims and allegations do *not* place F.S.'s right to a FAPE as the gravamen of F.S.' Complaint. Rather, as set forth in greater detail above, the crux of F.S.'s Complaint is intentional disability discrimination through the systematic exclusion of F.S. from its Cheerleading Program. Thus, this Court's decision in *J.L.* does not support the District Court's decision here.

## CONCLUSION

Based upon the foregoing, F.S. respectfully requests that this Court vacate the District Court's order in this matter and remand to the District Court for further proceedings.

Respectfully Submitted,

RepkaMazin, LLC

Date: __March 5, 2021__          By: __s/Joshua Mazin__
                                 Joshua S. Mazin, Esquire
                                 PA Id. #87680
                                 Lucas J. Repka, Esquire
                                 PA Id. #93509
                                 108 East Center Street
                                 Nazareth, Pennsylvania 18064
                                 (610) 365-2670
                                 *Attorneys for Appellant,*
                                 *F.S.*

## **CERTIFICATE OF COMPLIANCE**

I hereby certify pursuant to Federal Rule of Appellate Procedure 32(a)(7)(c) that this brief complies with the type volume limitation of Fed. R. App. P. 32(a)(7)(B) in that it contains 7,877 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii).

I hereby certify pursuant to Third Circuit Local Appellate Rule 31.0(c) that the text of the electronic version of this brief is identical to the text of the paper copies of this brief and that a virus detection program has been run on the electronic file of the electronic version of this brief using Sophos AntiVirus detection program and no virus was detected.

Date: March 5, 2021                    s/Joshua Mazin
                                       Joshua S. Mazin, Esq.

## <u>CERTIFICATE OF BAR MEMBERSHIP</u>

I, Joshua S. Mazin, certify pursuant to Federal Rule of Appellate Procedure 28.2(d) that my name appears on the foregoing brief and that I am a member in good standing of the Bar of the United States Court of Appeals for the Third Circuit, having been admitted on November 25, 2020.


Date: March 5, 2021                    *s/Joshua Mazin*

_____

Joshua S. Mazin, Esq.

# CERTIFICATE OF SERVICE

I, Joshua S. Mazin, hereby certify that a true and correct copy of the foregoing

Appellant's Brief was served upon the following by electronic filing and by United

States First Class Mail, Postage Prepaid:

> Joseph J Joyce, Esq.
> Jennifer Menichini
> Joyce, Carmody, & Moran, PC
> 9 N. Main Street, Suite 4
> Pittston, PA 18640
> jjj@joycecarmody.com
> jm@joycecarmody.com
> *Attorneys for Defendants*

Date: March 5, 2021

s/ Joshua Mazin
Joshua S. Mazin, Esq.

# IN THE UNITED STATES COURT OF APPEALS
# FOR THE THIRD CIRCUIT

---

## Docket No. 20-3321

---

## F.S.,

## Appellant

## v.

## Crestwood School District et al.

## Appellees

---

## APPELLANT'S APPENDIX

## VOLUME 1

## PAGES 1a-47a

---

Appeal from the Order of the Honorable Malachy E. Mannion, United States District Court for the Middle District of Pennsylvania, dated November 3, 2020, which dismissed Plaintiff's action without prejudice based upon the Court's lack of subject matter jurisdiction in light of the Plaintiff's failure to exhaust her administrative remedies under the IDEA.

---

RepkaMazin LLC

Joshua S. Mazin, Esquire
PA Id. #87680
Lucas J. Repka, Esquire
PA Id. #93509
108 East Center Street
Nazareth, Pennsylvania 18064
(610) 365-2670
*Attorneys for Appellant, F.S.*

# **TABLE OF CONTENTS FOR APPENDIX**

Notice of Appeal .................................................................................................1a

Order dated 11/3/20 ...........................................................................................4a

Opinion 11/3/20 signed by Judge Mannion ...................................................7a

Opinions not readily available

     *School District of Philadelphia*, 115 LRP 2743 (PSEA, No.
14498/13-14 AS, filed Dec. 17, 2014) ...........................................................24a

     *Walter D. Palmer Leadership Learning Partners Charter School*,
117 LRP 21589 (PSEA, Nos. 15959-1415AS, 15960-1415AS,
filed Mar. 31, 2017) ........................................................................................40a

# IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| **F.S.**, by and through<br>her Parent, **PAMELA SCARANO**<br><br>        Plaintiff<br><br><br>    v.<br><br><br>**CRESTWOOD SCHOOL<br>DISTRICT**;<br>**KERRI FEY**, individually and in her<br>official capacity as **HEAD<br>CHEERLEADING COACH<br>OF CRESTWOOD SCHOOL<br>DISTRICT**<br><br>        Defendants | **CIVIL ACTION NO. 3:19-1593**<br><br><br><br><br><br>**JURY TRIAL DEMANDED** |

## PLAINTIFF'S NOTICE OF APPEAL

TO ALL PARTIES AND THEIR ATTORNEYS OF RECORD:

Notice is hereby given that Plaintiff, F.S., by and through her Parent, Pamela Scarano, in the above-captioned case, hereby appeals to the United States Court of Appeals for the Third Circuit the Order granting Defendants' Motion to Dismiss Plaintiff's Complaint for lack of subject matter jurisdiction and dismissing Plaintiff's

Complaint entered by this Court in this action on the 3rd day of November, 2020. (Ex. A) (Doc. 30).

Respectfully submitted,

*Joshua S. Mazin*
_____
Joshua S. Mazin
Pa. ID. No. 87680
108 East Center Street
Nazareth, Pennsylvania 18064
Phone: (610) 365-2670
*Attorney for Plaintiff*

DATED: November 12, 2020

**Exhibit "A"**

# UNITED STATES DISTRICT COURT
# MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| F. S. by and through her parent **PAMELA SCARANO,** | : | |
| | : | |
| **Plaintiff** | : | **CIVIL ACTION NO. 3:19-1593** |
| **v.** | : | **(JUDGE MANNION)** |
| **CRESTWOOD SCHOOL DISTRICT** et al., | : | |
| | : | |
| **Defendants** | | |

## <u>ORDER</u>

In accordance with the memorandum issued this same day, **IT IS HEREBY ORDERED THAT:**

**(1)** Defendants' motion to dismiss, (Doc. 8), is **GRANTED** since the court lacks subject matter jurisdiction over Scarano's claims in Counts 1 and 2;

**(2)** Scarano's Complaint, (Doc. 1), is **DISMISSED WITHOUT PREJUDICE**; and

**(3)** The Clerk of Court is directed to **CLOSE THIS CASE**.

s/ *Malachy E. Mannion*
**MALACHY E. MANNION**
**United States District Judge**

**DATE: November 3, 2020**
19-1593-01-ORDER

4a

# IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

|  |  |
|---|---|
| **F.S.**, by and through<br>her Parent, **PAMELA SCARANO** |  |
| Plaintiff | **CIVIL ACTION NO. 3:19-1593** |
| v. |  |
| **CRESTWOOD SCHOOL DISTRICT**;<br>**KERRI FEY**, individually and in her official capacity as **HEAD CHEERLEADING COACH OF CRESTWOOD SCHOOL DISTRICT** | **JURY TRIAL DEMANDED** |
| Defendants |  |

## CERTIFICATE OF SERVICE

I, Joshua S. Mazin, hereby certify that on November 12, 2020, Plaintiff's Notice of Appeal, was served on the following counsel of record via email addressed as follows:

> Joseph J Joyce, Esq.
> Jennifer Menichini
> Joyce, Carmody, & Moran, PC
> 9 N. Main Street, Suite 4
> Pittston, PA 18640
> jjj@joycecarmody.com
> jm@joycecarmody.com
> *Attorneys for Defendants*

5a

Respectfully submitted,

*Joshua S. Mazin*

_____

Joshua S. Mazin
Pa. ID. No. 87680
108 East Center Street
Nazareth, Pennsylvania 18064
Phone: (610) 365-2670
*Attorney for Plaintiff*

DATED: <u>November 12, 2020</u>

6a

# UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| **F. S.[1] by and through her parent** | : | |
| **PAMELA SCARANO** | | |
| **SCARANO,** | : | |
| | | |
| **Plaintiff** | : | **CIVIL ACTION NO. 3:19-1593** |
| | | |
| **v.** | : | **(JUDGE MANNION)** |
| | | |
| **CRESTWOOD SCHOOL DISTRICT** | : | |
| **et al.,** | | |
| | : | |
| **Defendants** | | |

## MEMORANDUM

Before the court is a motion to dismiss for failure to state a claim filed by the defendants Crestwood School District (the "School District") and Kerri Fey ("Fey"). (Doc. 8). For the reasons set forth below, the motion to dismiss will be **GRANTED** for lack of subject matter jurisdiction and the Complaint, (Doc. 1), will be **DISMISSED WITHOUT PREJUDICE**.

---

[1] The court observes that, in captioning her Complaint, Scarano failed to abide by Local Rule 5.2, which indicates, "If the involvement of a minor child must be mentioned, only that child's initials shall be used." M.D.Pa.L.R.5.2(d)(2).

## I.    BACKGROUND

F.S. is a student in the Crestwood School District who suffers from multiple, serious physical and developmental disabilities, and is wheelchair-bound and non-verbal. F.S.'s mother, Pamela Scarano ("Scarano"), enrolled F.S. in the School District's cheerleading program, and expended approximately $300 on uniforms and a backpack. The cheerleading program is "not selective" insofar as no "cuts" are made to those wishing to participate. (Doc. 1, at 3). Scarano alleges the School District refused to make reasonable accommodations to allow F.S. to participate in the program. For example, Scarano alleges that Defendants did not allow F.S. to participate in a photograph with the team when the cheerleading coach, Kerri Fey ("Fey"), "chose to take the team photograph on a hill, rendering it exceedingly difficult for [F.S.] to join the team in her wheel chair." (Doc. 1, at 4). Scarano alleges that F.S. was "excluded" from another team photograph after a homecoming parade on September 30, 2017, when she "was left behind a fence [and] there was no plan to put other cheerleaders with [F.S.] or to include her at all." (Doc. 1, at 4).

- 2 -

8a

Scarano also alleges that F.S. was not ordered a uniform when the School District ordered uniforms for the other team members and that Scarano was forced to order a uniform separately. Additionally, Scarano alleges that F.S. was not asked to have her uniform embroidered like the rest of the team. As a result of Defendants' refusal to provide for reasonable accommodations, Scarano states that F.S. was "forced to cease seeking to participate" in the cheerleading program. (Doc. 1, at 4). Scarano alleges that the School District "has excluded at least one other participant on the basis of disability," but does not elaborate on the circumstances. (Doc. 1, at 4).

Scarano subsequently enrolled F.S. in the cheerleading program at a different school and she reports that this program has been "very supportive" of F.S. (Doc. 1, at 4). Nevertheless, Scarano states that she sent emails and a letter to Defendants, identifying the problems she encountered with the cheerleading program that remained unresolved.

On September 16, 2019, F.S., by and through Scarano, filed a two-Count Complaint against Defendants. (Doc. 1). She asserts the following causes of action: (1) intentional discrimination against F.S. on the basis of her disabilities in violation of Section 504 of the Rehabilitation Act in Count 1; and

- 3 -

(2) intentional discrimination against F.S. on the basis of her disabilities in violation of the Equal Protection Clause of the Fourteenth Amendment pursuant to Section 1983, as well as a *Monell* claim, in Count 2.

On November 11, 2019, Defendants filed the instant motion to dismiss, (Doc. 8), as well a brief in support, (Doc. 11). Scarano filed a brief in opposition, (Doc. 14), and Defendants filed a reply brief, (Doc. 19). The matter is now ripe for this court's review.

## II.    STANDARD

Defendants' motion to dismiss is brought pursuant to Federal Rule of Civil Procedure 12(b)(6), which provides for the dismissal of a complaint, in whole or in part, if the plaintiff fails to state a claim upon which relief can be granted. In deciding a defendant's motion, the court must read the complaint in the light most favorable to the plaintiff and all well-pleaded, material allegations in the complaint must be taken as true. *Estelle v. Gamble*, 429 U.S. 97 (1976). However, the court need not accept inferences drawn by the plaintiff if they are unsupported by the facts as set forth in the complaint. *See California Pub. Employee Ret. Sys. v. The Chubb Corp.*, 394 F.3d 126, 143

- 4 -

(3d Cir. 2004). The court also need not accept legal conclusions set forth as factual allegations. *Bell Atlantic Corp. v. Twombly*, 550 U.S. 554, 555 (2007).

In deciding a motion to dismiss, the court should generally consider only the allegations contained in the complaint, the exhibits attached to the complaint, matters of public record, and "undisputably authentic" documents which the plaintiff has identified as the basis of his claim. *See Pension Benefit Guarantee Corp. v. White Consolidated Industries, Inc.*, 998 F.2d 1192, 1196 (3d Cir. 1993).

Additionally, the court should generally grant leave to amend a complaint before dismissing it as merely deficient. *See, e.g.*, *Fletcher-Harlee Corp. v. Pote Concrete Contractors, Inc.*, 482 F.3d 247, 252 (3d Cir. 2007); *Grayson v. Mayview State Hosp.*, 293 F.3d 103, 108 (3d Cir. 2002); *Shane v. Fauver*, 213 F.3d 113, 116-17 (3d Cir. 2000). "Dismissal without leave to amend is justified only on the grounds of bad faith, undue delay, prejudice, or futility." *Alston v. Parker*, 363 F.3d 229, 236 (3d Cir. 2004).

- 5 -

## III.    DISCUSSION

Defendants move for dismissal of both Counts of the Complaint. With respect to Count I, Defendants argue it must be dismissed due to Scarano's failure to exhaust administrative remedies as is required under the Individuals with Disabilities Education Act ("IDEA"). The primary focus of Defendants' argument for Count 2's dismissal is that it fails as a matter of law because Scarano has failed to identify similarly situated individuals that were treated differently or to allege intentional discrimination; however, Defendants additionally argue that Count 2 should be dismissed because it is likewise subject to the administrative exhaustion requirement of the IDEA.

The purpose of the IDEA is to "assure that all handicapped children have available to them . . . a free appropriate public education," or "FAPE." 20 U.S.C. §1400(c). In order to receive federal funding to aid in the education of the disabled, states must provide programs that comply with IDEA requirements. 20 U.S.C. §1412. Included in the requirements is that the state have in effect "a policy that assures all children with disabilities the right to a free appropriate public education." 20 U.S.C. §1412(1). This is implemented through use of an "individualized educational program" or "IEP," which is

- 6 -

created for each disabled child and sets out "the child's present educational performance, establishes annual and short-term objectives for improvements in that performance, and describes the specially designed instruction and services that will enable the child to meet those objectives." *Honig v. Doe*, 484 U.S. 305, 311 (1988); 20 U.S.C. §1412(4). Thus, the IEP is "the centerpiece of the statute's educational delivery system" and "serves as the 'vehicle' or 'means' of providing a FAPE." *Fry v. Napoleon Community Schools*, ⸺ U.S. ⸺, 137 S.Ct. 743, 753 (2017).

The IDEA "sets forth an administrative mechanism for resolving disputes concerning whether a school has complied," "provides for an impartial due process hearing conducted by the state or local educational agency," and provides "the right to appeal the results to the state educational agency if the due process hearing was conducted by the local educational agency." *Wellman v. Butler Area School District*, 877 F.3d 125, 131 (3d Cir. 2017). Pertinent here, the IDEA "requires parties to use these procedures whenever they seek relief 'available under this subchapter' even if they are pursuing relief under other federal laws." *Id.* (quoting 20 U.S.C. §1415(l)). "Thus, a plaintiff who seeks relief available under the IDEA must exhaust his

- 7 -

administrative remedies before filing a lawsuit, even if he relies on laws other than the IDEA." *Id.*

Here, Scarano's Complaint does not explicitly mention IDEA. Instead, it is brought pursuant to Section 504 of the Rehabilitation Act, 29 U.S.C. §794, and Section 1983. Section 504 prohibits discrimination against the disabled in federally funded programs. In particular, it provides:

> No otherwise qualified individual with a disability in the United States, as defined in section 706(8) of this title, shall, solely by reason of her or his disability be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance . . . .

*Id.* To establish a claim under Section 504, a plaintiff must demonstrate that he "(1) has a disability; (2) was otherwise qualified to participate in a school program; and (3) was denied the benefits of the program or was otherwise subject to discrimination because of [his] disability." *Chambers v. Sch. Dist. of Phila. Bd. of Educ.*, 587 F.3d 176, 189 (3d Cir.2009).

Both Section 504 and the IDEA provide equivalent requirements: They "promise non-discriminatory access to public institutions." *Fry,* 137 S.Ct. at 756. However, Section 504 covers "people with disabilities of all ages, and

- 8 -

14a

do[es] so both inside and outside schools." *Id.* By contrast, the IDEA "protects only 'children' (well, really, adolescents too) and concerns only their schooling." *Id.* at 755. As noted, the IDEA requires administrative exhaustion.

The parties do not dispute that Scarano did not exhaust her administrative remedies. "In the normal case, exhausting the IDEA's administrative process is required in order for the statute to 'grant subject matter jurisdiction to the district court.'" *Haddon Heights Bd. of Educ.*, 90 F.Supp.3d at 334 (citing *Batchelor v. Rose Tree Media School Dist.*, 759 F.3d 266, 272 (3d Cir. 2014) (quoting *Komninos v. Upper Saddle River Bd. of Educ.*, 13 F.3d 775, 778 (3d Cir. 1994)). Therefore, if Scarano's claims fall under the IDEA—whether or not the pleading references the IDEA—this court must dismiss the Complaint for lack of subject matter jurisdiction due to the failure to first exhaust administrative remedies.

In determining whether they do, a court must "consider the 'crux'—the 'gravamen'—of the complaint to determine whether a plaintiff seeks relief for 'denial of the IDEA'S core guarantee [of] . . . a free and appropriate education [FAPE]'; if so, then the plaintiff must exhaust his administrative remedies under the IDEA." *Wellman*, 877 F.3d at 127 (internal citation omitted). In

- 9 -

considering whether the gravamen of a plaintiff's complaint is the denial of a FAPE, the Supreme Court in *Fry* posed two hypothetical questions to consider. First, could "the plaintiff have brought essentially the same claim if the alleged conduct had occurred at a public facility that was not a school— say, a public theater or library? And second, could an adult at the school— say, an employee or visitor—have pressed essentially the same grievance?" *Wellman*, 877 F.3d at 132 (citing *Fry*, 137 S.Ct. at 756).

Here, the court finds the answer to both questions to be no. Consequently, the court finds that the Complaint concerns denial of a FAPE and alleges, at its core, that F.S.'s injuries related to a FAPE—that is, they were proximately caused when Defendants failed to adhere to the IEP. *See id.*

Scarano argues that the answers to both questions are yes:

> First, [Scarano] could have brought the same claim if the alleged discriminatory conduct occurred at a public facility other than a school, *i.e.*, through a municipal program that offered sports or extracurricular activities. In addition, an adult at the school, *i.e.*, an employee who wished to serve as a coach, but was excluded from doing so based on intentional discrimination arising from that

- 10 -

> individual's disability, could press the same grievance.

(Doc. 14, at 14). The court agrees with Defendants, however, that Scarano's cheerleading coach analogy is faulty. It seems apparent that participation in the School District's middle school cheerleading program is not a claim that could be asserted in a non-school setting or by a non-student adult given that non-student adults cannot be student cheerleaders.

Scarano additionally contends that, because her claims pertain only to F.S.'s participation in the cheerleading program, and because the Complaint makes no reference to the adequacy of the special education services provided by the School District, her claims cannot be considered to pertain to denial of a FAPE. As Defendants observe, however, exclusion from full participation in an extracurricular school activity can indeed—and in this case does—constitute an IDEA claim since the IDEA mandates that IEPs include provisions for disabled students to participate in "extracurricular and other nonacademic activities." *See* 20 U.S.C. §1414(d)(1)(A)(i)(IV).

Additionally, courts have previously found similar claims to have involved the denial of a FAPE, even if a FAPE is not explicitly mentioned in

- 11 -

the complaint. *See Wellman*, 877 F.3d at 134 (holding that a student's equal protection claims alleging a failure to ensure that the student was not placed in a dangerous situation at an extracurricular activity, football, pertained to a FAPE); *Ahearn v. East Stroudsburg School District*, No. 3:19-868, 2020 WL 754337, at *6 (M.D.Pa. Feb. 13, 2020) (finding that the gravamen of a student's discrimination claims relating to the use of physical restraints in school pertained to the denial of a FAPE); *J.L. v. Wyoming Valley W. Sch. Dist.*, No. 3:15-1750, 2016 WL 4502451, at *4 (M.D.Pa. Aug. 29, 2016), *aff'd* 722 Fed.App'x 190 (3d Cir.2018) (same with respect to a student's discrimination claims relating to school transportation). As the Third Circuit has stated, "What matters is the crux . . . of the plaintiff's complaint, setting aside any attempts at artful pleading. [When the plaintiff]'s own allegations and claims place[] the denial of a FAPE in this central role, [] [she] cannot negate this fact simply by omitting educational redress from [her] prayer for relief." *J.L.*, 722 Fed.App'x at 194.

Here, both of Scarano's federal claims against Defendants pertain, in large part, to the alleged deprivation of educational services to F.S. and both involve F.S.'s educational experience. *See* Doc. 1, at 6-7 (alleging that

- 12 -

Defendants' discrimination caused F.S. to "suffer substantial educational and developmental losses, including permanent decline in her future development"). Thus, because Scarano's factual allegations are "intertwined with [her] complaints about the school's failure to accommodate [F.S.'s] educational needs, *which include [her] participation in extracurricular activities*, and because such allegations could not be brought by a nonstudent or outside the school setting, the claim set forth in Count [2] seeks relief for failing to provide a FAPE and is subject to exhaustion." *Wellman*, 877 F.3d at 134 (emphasis added) (internal citation omitted).

Scarano next argues that the history of the proceedings suggests that the gravamen of her suit is not the denial of a FAPE. Citing *Fry*'s statement that the "prior pursuit of the IDEA's administrative remedies will often provide strong evidence that the substance of a plaintiff's claim concerns the denial of a FAPE," 137 S.Ct at 757, Scarano argues that the fact she never attempted to pursue administrative remedies indicates her claims are unrelated to a FAPE. This argument is unavailing. Neither *Fry* nor *Wellman* indicated that prior pursuit of administrative remedies is a dispositive factor in the analysis—but, instead, merely something to consider. Scarano's

- 13 -

failure to first seek administrative remedies indicates only that she would prefer to have her case heard in court. Had Scarano first pursued an administrative remedy only to abandon the process in order to seek redress in court, that would indeed suggest an attempt to circumvent administrative review. However, the fact that Scarano did not do so does not, *ipso facto*, mean the reverse—*i.e.*, that her claims are not subject to the administrative exhaustion requirement—particularly where the answer to the two questions that *Fry* specifically directed the court to consider is no.

Lastly, Scarano argues that the futility exception to the exhaustion requirement should apply due to the fact she seeks monetary and punitive damages which an administrative hearing officer cannot award. Significantly, however, the Third Circuit has repeatedly rejected this argument:

> Our conclusion [that the plaintiff failed to exhaust administrative remedies] does not change because [he] requested money damages, which are not available under the IDEA and cannot be awarded at an administrative hearing. We have held that "[t]his is not dispositive" because (1) the complaint did not seek money damages exclusively, (2) district courts are empowered to grant relief beyond that requested, and (3) money damages may sometimes be awarded as reimbursement.

- 14 -

*J.L.*, 722 Fed.App'x at 194. (internal citations and quotation marks omitted). Likewise, here, Scarano did not exclusively seek monetary damages and for the same reasons stated in *J.L.*, the futility exception to the administrative exhaustion requirement does not apply here.

Finally, as an aside, the court notes that, even if Count 2 were not subject to dismissal for failure to exhaust pursuant to the IDEA, it would nevertheless be subject to dismissal for failure to state a claim. As Defendants correctly note, Scarano brings her Count 2 equal protection claim on the basis of F.S.'s physical disabilities and, because physical disability is not a protected class, it must be analyzed under a class-of-one theory. *Village of Willowbrook v. Olech*, 528 U.S. 562, 564 (2000) (holding that those who are not members of a protected class may bring an equal protection claim under a theory of a "class of one"); *City of Cleburne v. Cleburne Living Center*, 473 U.S. 432, 446 (1985) (holding disability is not a suspect class under the Equal Protection Clause). To do so, however, Scarano must identify similarly situated parties and allege that they were treated differently by Defendants. Because she has not done so, Scarano's equal protection claim fails. Although the Complaint makes a vague

- 15 -

reference to "at least one other participant" in the cheerleading program with a disability, (Doc. 1, at 4), Scarano's pleading has fallen short of sufficiently identifying any similarly situated parties that are "alike in all relevant aspects" to F.S. that were treated differently. *Perano v. Twp. Of Tilden*, 423 Fed.App'x 234, 238 (3d Cir. 2011) ("At the motion to dismiss stage, [the plaintiff] must allege facts sufficient to make plausible the existence of such similarly situated parties."). Accordingly, even if not subject to dismissal on the basis of failure to administratively exhaust remedies, dismissal of Count 2 for failure to state an equal protection claim would otherwise be appropriate.[2]

---

[2] Because Scarano has failed to state an equal protection claim in Count 2, "it is axiomatic that [her] *Monell* claim[] must also fail as a matter of law." *Bensinger v. Twp. Of Hegins*, No. 3:15-cv-1450, 2016 WL 1232353, at \*6 (M.D.Pa. Mar. 30, 2016). Additionally, Scarano's *Monell* claim also fails because she has failed to "specify exactly what the custom or policy was." *McTernan v. City of New York*, 564 F.3d 636, 658 (3d Cir. 2009).

## IV.    CONCLUSION

For the reasons set forth above, Defendants' motion to dismiss, (Doc. 8), is **GRANTED**, and the Complaint, (Doc. 1), will be **DISMISSED WITHOUT PREJUDICE**.

An appropriate order will follow.


s/ *Malachy E. Mannion*
**MALACHY E. MANNION**
**United States District Judge**

**DATE: November 3, 2020**
19-1593-01

- 17 -

23a

115 LRP 2743

## School District of Philadelphia
## Pennsylvania State Educational Agency
### 14498/13-14 AS
### December 17, 2014

### Related Index Numbers

**405.050 Harassment/Retaliation**

**140.005 Discrimination**

**145. DELINQUENT/TRUANT CHILDREN**

**150.030 Suspension**

**150.040 Violent Students**

### Judge / Administrative Officer

**Linda M. Valentini, Certified Hearing Official**

### Ruling

Finding no evidence of a causal connection between a parent's advocacy on behalf of her teen with an SLD and the actions taken by a private school when the teen eloped on two occasions, an independent hearing officer concluded that the private school did not engage in retaliation in violation of Section 504.

### Meaning

To establish a Section 504 retaliation claim against a school district, the aggrieved party must have engaged in a protected activity, the district must have taken action sufficient to deter the exercise of the protected activity, and the two actions must be causally connected. Although there was no question this teen's parent advocated on his behalf and that the private school he attended part time with funding from his school district called the police when he eloped, the evidence established that the school would have taken the same actions even if the parent had not engaged in the protected activity.

### Case Summary

A private school's adherence to protocol when a Pennsylvania teen with an SLD eloped on two occasions helped it deflect assertions that its actions were retaliation for the parent's advocacy on the teen's behalf in violation of Section 504. The teen attended a vocational/technical high school for half the day and a private school for the remainder of the day. The district funded his private school placement. While attending the private school, the teen physically assaulted an art teacher, prompting a two-day suspension. Weeks later, he left the private school building on two separate days after asking to use the restroom. The school was ultimately able to reach the parent the first time, who confirmed that the teen had left school because of a family emergency. However, on the second occasion, when the parent stated she did not know where the teen was, the school called the police. The parent filed for due process, asserting that the teen's suspension and the school's contacting the police violated Section 504 because they were retaliation for her previous advocacy. The independent hearing officer explained that a Section 504 retaliation claim against a district may proceed if the aggrieved party shows that she engaged in protected activity, the district took action sufficient to deter engaging in the protected activity, and the two actions were causally connected. Noting that the private school had never experienced a violent act on a teacher in its 30-year history, the IHO concluded that the school's suspension of the teen and reporting the incident to the police were justified. With regard to the eloping incidents, the IHO likewise concluded that the school's actions were reasonable under the circumstances. "I cannot imagine responsible school staff failing to act to locate a student when a parent admits that she does not know for sure where her child is," the IHO commented. The IHO further observed that the evidence clearly established that the school would have taken the same actions absent the parent's participation in the protected activity, given its protocol to contact the police when a child leaves school grounds without permission.

### Full Text

APPEARANCES

Parties to the Hearing: Parent[s]

Representative:

24a

Benjamin Hinerfeld, Esquire

Michele Reichow, Esquire

Law Offices of Benjamin J. Hinerfeld

2 Penn Center, Suite 1020

1500 JFK Blvd - Philadelphia, PA 19102

Sonja Kerr, Esquire

PILCOP

1709 Benjamin Franklin Parkway, 2 nd Floor Philadelphia, PA 19103

School District of Philadelphia Office of General Counsel 440 N. Broad Street, 3rd Floor Philadelphia, PA 19130

Brian Subers, Esquire

Fox Rothschild, LLP

10 Sentry Parkway, Suite 200

P.O. Box 3001

Blue Bell, PA 19422-3001

Main Line Academy 124 Bryn Mawr Avenue Bala Cynwyd, PA 19004

Gabrielle Sereni Raffaele & Puppio 19 West Third Street Media, PA 19063

Date Record Closed: Date of Decision: Hearing Officer:

December 10, 2014 December 17, 2014

Linda M. Valentini, Psy.D., CHO

Certified Hearing Official

2

Procedural History

The Parent filed the complaint that is addressed in this decision on December 4, 2013 while another special education due process hearing [ODR #13887/12-13 AS] was in progress before another hearing officer. In order to avoid the possibility of differing conclusions on the same fmdings of fact, the evidentiary portion of this hearing was postponed until after a decision had been rendered in the earlier case. However, a first session was convened for the purpose of placing the parties' opening statements on the record. Although notice was given, there was no one from the private school [Private School] at this first session and the Private School's original attorney did not appear. After the decision regarding ODR #13887/12-13 AS was issued on March 13, 2014 a session was scheduled and held to begin the presentation of evidence in the instant matter. Prior to the convening of the following scheduled session the Parent through counsel indicated that the matter was likely settling and further sessions were not necessary; the parties requested and were granted a 60-Day Conditional Dismissal Order. However, the matter ultimately was not resolved, and a final session was convened. The parties chose to file written closing briefs and accordingly requested an extension of the decision due date.

Background

Student' is a teenaged student with a specific learning disability who has been identified as eligible for special education under the Individuals with Disabilities Education Act [IDEA] in accordance with Federal and State Standards. 2 Student resides in the District with Student's mother and siblings. Student currently attends a District vocational/technical high school [High School] full time, but previously had a split daily schedule: a half-day in the High School and the other half day in Private School, with the latter placement being funded through the District pursuant to an agreement with Student's Parent.

The Parent filed this due process complaint against both the District and the Private School, raising claims under Section 504 of the Rehabilitation Act of 1973, 3 and the Americans with Disabilities Act, 4 as well as the federal and state regulations implementing those statutes. The Parent alleges that the Private School and the District engaged in discriminatory and retaliatory acts against Student because the Parent had filed two previous due process complaints' which had asserted a denial of a free appropriate public education [FAPE] to Student under the IDEA.

I lack jurisdiction to consider claims under the ADA that are not directly related to allegations of

denial of FAPE. My authority arises under the IDEA and the federal and

i This decision is written without further reference to the Student's name or gender, and as far as is possible, other singular characteristics have been removed to provide privacy.

2 34 C.F.R. §300.8(a)(1), (c)(10); 22 Pa. Code §14.102 (2)(ii).

3 29 U.S.C. § 794.

4 42 U.S.C. §§ 12101 et seq.

'Prior to ODR #13887/12-13 AS noted above was ODR#3111/11-12 KE with HO Jake McElligott presiding and a Decision issued on June 18, 2012.

3

state regulations implementing that statute, as well as the state regulations implementing Section 504. 6 Special education due process hearing officers have authority to decide issues relating to a proposed or refused initiation of or change in the child's

identification, evaluation, or educational placement; or the provision of FAPE to a child, under the IDEA. 7 In Pennsylvania, they are also granted authority to decide FAPE and related issues under Section 504, including discrimination against a student based upon disability, in accordance with the procedures provided by the IDEA and Pennsylvania's Chapter 14. 8 The instant matter does not allege a denial of FAPE. I find nothing in 22 Pa. Code Sections 14.102(a)(1), 14.102(a)(2), or 15.1(a) that bestows jurisdiction over non FAPE-related claims arising under the Americans with Disabilities Act...(i)n particular...claims under regulations implementing Title II of the ADA 28 C.F.R. Section 35.160. Accordingly I will not make any findings or determinations related to claims under the Americans with Disabilities Act.

On December 11, 2013 the District through counsel filed a Motion to Dismiss arguing that the hearing officer lacked jurisdiction because hearing officers cannot award monetary damages, because at least one hearing officer has said that Parents may not

have a due process hearing solely on discrimination-based claims, and that any denial of FAPE claims were already before another hearing officer in the IDEA Action. The Parent through Counsel responded to the District's Motion on December 12, 2013. I issued a ruling denying the District's Motion; the ruling 9 is attached to this Decision as Appendix One.

Several months after the initiation of these proceedings, and after the first hearing session, Private School through newly retained counsel filed a Motion to Dismiss; an Answer was filed on the Parent's behalf in a timely manner. For reasons amply put forth in the Parent's Answer with which I was in agreement I denied the Private School's Motion but did not grant the Parent's petition for summary judgment against the Private School, which Motion was based upon the Private School's failure to timely file an Answer to the due process Complaint. 1°

Issue[s]

Did Private School and/or the School District of Philadelphia [District], through its agent Private School, act in a discriminatory and retaliatory manner toward Student and Parent because the Parent had filed previous due process complaints against the District?

6 See 20 U.S.C. § 1415; 34 C.F.R. §§ 300.500-300.520; 22 Pa. Code §§ 14.162, 15.1, 15.8.

7 34 C.F.R. §§ 300.503, 300.507, 300.511.

822 Pa. Code §§ 15.1 - 15.11.

9 Redacted in order to protect Student's privacy.

1° At the second hearing session Parent's counsel renewed the Motion for summary judgment and it was

again denied. [NT 65]

4

Stipulations

Private School and the District stipulate that Student is a qualified individual with a disability under Section 504 of the Rehabilitation Act. 11

At all times relevant to this complaint, Private

School received funds through the District.

Findings of Fact 12

Background 13

1. During the time period relevant to this matter Student was attending Private School, a licensed private academic school that serves students with disabilities. At the time of the hearing Private School had been in existence for about 30 years and had been founded by its current director. 14 [NT 123, 238, 405, 448, 502; MLA-5]

2. Private School received payments under its contracts with the District to educate Student during the 2012-2013 and 2013-2014 school years. 15 [NT 129-134]

3. Private School was providing educational services to Student on behalf of the District under the terms of a prior settlement agreement. [NT 72, 134]

4. The contract between Private School and the District provides that the District remains the Local Educational Agency [LEA] with respect to all students educated at Private School pursuant to the contract. [P- 2]

5. During the time period relevant to this matter, Student was participating in a split-day program, attending a District vocational/technical high school [High School] for [a trade] from approximately 7:50 a.m. until 9:30 a.m., depending on which of

ii Student is also an eligible student under the Individuals with Disabilities Education Act [IDEA]. This hearing does not address any issue related to a denial of FAPE under the IDEA.

12 Exhibits are marked as follows: "MLA" is the Private School, "S" is the District and "P" is the Parent.

13 During the hearing Parent's counsel sought to elicit testimony about events in the spring of 2013 that led to the Parent's filing the complaint that was presided over by another hearing officer between May 29, 2013 and January 28, 2014 with a decision issued on March 13, 2014. As the issue before me is whether the District and/or Private School retaliated against the Parent because she exercised advocacy for her child by filing complaints, that line of questioning was ruled inadmissible and testimony was limited to events after the complaints were filed. [NT 109-113] Nevertheless, in Parent's closing statement considerable detail was offered about earlier events that pursuant to my ruling are not part of the record in the instant matter [Parent's Closing Brief, Proposed Findings of Fact #31 through #65]. In writing this decision I did not weigh this information, as it is argument rather than evidence that was subject to cross examination. To the extent that the information was an offer of proof, I did review it, and here note that this additional material did not serve to alter my finding in this matter.

14 However, on information and belief, Private School ceased academic operations following the 2013-14 school year. [Parent's Closing Brief]

15 Student attended Private School as a full-time student during the 2008-2009, 2009-2010, 2010-2011 and 2011-2012 school years. [Parent's Closing Brief]

5

four schedules the High School was following that day, at which time Student would be transported by taxi 16 to Private School to receive the academic components of Student's program. [NT 85-86]

6. Student received direct instruction at Private School in literacy, mathematics, and transition planning as well as direct instruction in the vocabulary and specific mathematics necessary for Student's successful participation in the High School [trade] program. [NT 87, 236-237, 477-478]

7. The High School and the Private School worked cooperatively to coordinate Student's program, and, in particular, Private School's support for Student's participation in the High School vocational program. [NT 87, 394-395, 430-431, 437, 484-485, 507-508; MLA-8, MLA-10]

8. Academic support for Student's participation in the High School vocational program was a priority for Private School. [NT 507-508]

October 24, 2013

7. Given the shortened school day Student was not regularly scheduled to attend specials [art, physical education and music] at the Private School. Private School attempted to provide Student opportunities to participate in these specials as Student's and the teachers' schedules would allow, but only if the primary teachers were otherwise able to cover Student's academic needs, in particular, supporting assignments Student received from High School. [NT 295, 394-395, 484-485]

8. During the 2013-2014 school year, eight to nine students attended Private School which had a total of eight teachers, two full time and the rest part time. Private School tended to have few disciplinary issues with its students. [NT 105, 123124, 250, 479-480]

9. At the beginning of the school year Student had been provided written materials regarding behavioral expectations which were reviewed with Student, as well as ongoing behavioral support regarding the daily transition from High School to Private School. [NT 478, 481-483; MLA-7]

10. Although Student exhibited a positive attitude and improved behavior at Private School at the start of the 2013-2014 school year, as the year progressed, Student started to get off track with what the expectations were at Private School. [NT 434-435, 483; MLA-8]

11. On October 24, 2013, Student's two principal teachers, both female, planned to meet with Student to review behavioral expectations, and to provide Student with a behavior plan. [NT 483-484; MLA-9]

16 I take judicial notice that according to MapQuest this is a distance of 21.4 miles and that given optimal traffic conditions travel time is about 30 minutes.

6

14. The two teachers approached Student as Student entered Private School that morning and requested that Student meet with them, but Student failed to comply with repeated requests from the teachers to step into a classroom with them. [NT 484-486]

15. Hearing the commotion in the hallway, a male teacher, who at the time was teaching art class, stepped into the door frame of his classroom and looked into the hallway. The art teacher saw Student having an argument with the two female teachers, who were attempting to get Student to go into another classroom. [NT 313-315; MLA-11]

16. Student had been informally scheduled for art class at the time Student arrived. Student began moving toward the art teacher and tried to enter the art teacher's classroom. Student said "What's this? What's this?" to the art teacher. The art teacher signaled to Student not to go into his classroom, and Student began pushing the art teacher forcefully against his arm and chest to gain entrance to the classroom. [NT 315-318, 329-330, 485; MLA-11]

17. The art teacher received an abrasion to his hand. [NT 323; MLA-11, MLA-13]

18. During the altercation, the art teacher yelled to Student: "Whoa ... you pushed me" in an attempt to focus Student on the inappropriate conduct and deescalate the situation!' [NT 313, 315-328, 487; MLA-11]

19. Student's two primary teachers and the art teacher immediately met with Student in a classroom to discuss the incident and the seriousness of Student's actions. Student did not deny physically pushing the art teacher, but did not acknowledge that this was wrong or apologize, despite being requested to do so. [NT 329, 376378, 384, 399, 422-423, 456, 487-488; MLA-11]

20. The art teacher then reported the incident to the Private School's director. [NT 332; 333; MLA-11]

21. The art teacher considered this to be an extreme incident; although he has been threatened by other students in the past, no student has ever put his/her hands on him in a violent manner. [NT 349]

22. Student's physically engaging a teacher and causing an injury was deemed to be a serious offense,

one that had not previously occurred with any student at Private School. There is zero tolerance for putting hands on a teacher at Private School. [NT 242-243, 346, 349, 401, 424, 439, 480, 492-493]

23. Student received a two-day suspension for the incident, the Parent was notified of such by letter, and the letter indicated that the Parent was required to come with

17 At the hearing the teacher was asked to reenact his physical positions during the event and did so.

7

Student to school when Student was reinstated so that Student's behavior could be discussed. [NT 333, 357, 412-414, 457, 489, 497-498; MLA-5, MLA-8, MLA-11]

24. The suspension letter also noted that Student had to earn attendance at specials classes, and would lose privileges for "refusing to listen to directions and replying in a disrespectful manner." [NT 356-357; MLA-11]

25. The director also spoke directly with the Parent on the telephone on the day of the incident, with Student present in the office for the phone call at Parent's request. The director let the Parent know she wanted to meet with her to discuss the seriousness of the incident. [NT 182-184]

26. The Private School director recommended to the art teacher that he consider filing a record of the incident with the township police department, as no incidents of this type had ever happened with any pupil at Private School previously and as Student had previous conflicts with this teacher and had engaged in consistent inappropriate and disrespectful behavior that was disruptive to the learning environment. After discussing this with the director and other staff the art teacher decided that filing an incident report with the police was a reasonable course of action. [NT 203-204, 207, 214, 345-346, 348-349, 353, 356, 359-360, 375; MLA-11]

27. Private School records indicate that the art

teacher's call to the township police department was intended to protect both Private School and Student. [MLA-8]

28. Private School did not notify the High School special education liaison of the incident or of its intention to contact or its having contacted the township police department. [NT 81, 143]

29. Following the art teacher's phone call to the township police department a police officer arrived and took a statement, but indicated that he did not think that the incident warranted further police action. The art teacher did not dispute this position or request further action by the police department. [NT 385, 397; MLA-8]

30. After the initial report to the police department, a detective later contacted the art teacher and reported that upon reviewing the matter the detective considered it possibly more serious than the initial responding police officer had. Sometime between October 28, 2013 and November 6, 2013 the detective requested that the art teacher meet with him at the police station and provide a further statement, and the art teacher complied with the detective's request and dictated a statement. However, in response to the detective's inquiry, the art teacher stated that he did not want to take the matter any further as his intent was to make Student understand the seriousness of Student's behavior, not to pursue legal avenues. [NT 353-355, 385-388, 392, 427; MLA-8, MLA-11]

8

31. Private School did not contact the District prior to the decision to suspend Student and Student was not suspended from the High School, nor precluded from attending the High School or participating in Student's educational program at the High School during the Private School suspension. Student's Private School suspension was not made a part of Student's District record. 18 [NT 90-91, 99-100, 262]

32. The High School special education liaison

had no contact with the township police department and did not forward any information to the township police department. [NT 80-82]

33. The District learned of the incident and the filing of a police report through communications between counsel, subsequent to the detective's follow-up with Private School and the Parent. [NT 91-92; S-9]

34. Although the Parent did not meet with the staff or accompany Student to the reinstatement as requested verbally and by letter, Student was permitted to return to Private School after the two days of suspension. [NT 185, 390, 490, 498; S-3; S-4; S-5; S-6]

35. No person from Private School initiated any contact with the township police department subsequent to the detective's follow-up with the art teacher except for a teacher's calling the station for the purpose of obtaining the detective's name and contact information for the files. [NT 396-398, 400, 402-403, 424, 442-444, 472]

36. By correspondence dated February 28, 2014, the art teacher was contacted by the County Juvenile Probation Department [Juvenile Probation] and requested to complete and return a comment form in conjunction with an intake conference for Student at Juvenile Probation. [NT 388, 398; MLA-13]

37. After reviewing this request with fellow Private School staff, the art teacher, with editing assistance from another teacher, prepared a response to Juvenile Probation and sent it on March 10, 2014. [NT 400, 416-417, 465-468; MLA-11, MLA-13]

38. Information provided to Juvenile Probation noted the Parent's failure to support the Private School's disciplinary procedures in Student's presence and indicated a concern about Student's ability to cooperate with any interviews in mother's presence. [NT 248-249; MLA-13]

39. The Private School team believed that the purpose of Juvenile Probation's February 2014 request that the art teacher complete additional paperwork,

18 Student was not a discipline problem at High School. Student was compliant and followed directions, with the exception of homework completion. Student was well-liked by the [trade] teacher. [NT 84, 88-89, 98]

9

including a victim impact statement, was not for purposes of a criminal prosecution, but rather to ascertain how to assist Student. [NT 470-471]

40. Student's two-day suspension for the incident, the subsequent report to the township police department, and the response to Juvenile Probation's request for information were not related to the Parent's filing of due process complaints against the District or any ill-will among Parent, Student, Private School and/or the District. [NT 92, 244, 401, 406-407, 410, 493-494]

November 15, 2013

41. On November 15, 2013, after receiving a phone call from the Parent, Student asked to use the restroom. After ten minutes had passed and Student had not returned to class one of the primary teachers went to check on Student and found Student had left the Private School building. [NT 421, 462-464, 495; MLA-8]

42. After repeatedly attempting to reach the Parent, the teacher called the High School's special education liaison to report the child missing and inform her of the intent to contact the township police department for assistance. 19 As soon as this conversation ended the teacher did hear from mother and was told there had been a family emergency, so the police were not called. [NT 421, 462-464, 494495; MLA-8, MLA-10]

43. Any of the Private School staff was authorized to contact police if a situation warranted such action. [NT 115]

44. At some unspecified point Private School's director called the High School special education liaison to determine if there had been any changes to a District policy that the police should be called when a

student leaves a school building without permission. She was advised that the policy was still in place. [NT 157, 159, 262-263]

45. Calling the police when a student leaves the school building without permission, whereabouts unknown, is done to fulfill the District's and the Private School's responsibility to ensure the safety of the student. [NT 194, 245, 263-267]

November 21, 2013

42. On November 21, 2013 Student complained to one of the primary teachers that Student's heart was racing and asked to go to the restroom. The teacher offered to contact the school nurse, but Student declined. After five minutes, this teacher went to check on Student but Student was not in the building. The teacher immediately [around 10:40 am] contacted Parent. Parent stated that she didn't know where [Student] was, but "thought [Student] was fine ... [Student] was probably at [Student's] grandmother's house and that she would call the police if

19 I take notice that according to MapQuest the exact distance between Private School and Student's home is 20.2 miles. See also HO-1. Given this distance the Private School had additional reason to be concerned as Student did not live nearby.

10

she was still concerned". The teacher told the Parent that she would apprise the director of the incident. [NT 460-462, 495-496, 499-500; MLA-8]

47. Because the Parent had said she did not know where Student was, and given the need to ensure that the students were always safe, the director contacted the police herself. [NT 222, 227, 229-230, 245, 267, 440-441, 496]

48. The police arrived at Private School at approximately 10:50 am and after several attempts the officer was able to reach the Parent by telephone. The phone conversation between the officer and the Parent ended when one or the other hung up the phone abruptly. The police officer advised the Private School staff that Parent refused to cooperate and that

the township police would not further investigate the matter. At approximately 11:24 am, after the police had been called and after the officer had spoken to the Parent, the Parent sent the teacher an e-mail indicating that Student had contacted Parent and that Student was safe; she did not disclose Student's whereabouts. [NT 231, 462, 472, 495-499-500; MLA-8, MLA-10]

49. The police came back to Private School later that afternoon and reported that they still had not located Student. [NT 232]

50. The Private School director sent a letter to the Parent late on the afternoon of this incident noting that when a student leaves a school building without permission police are contacted for the safety of the student. The director requested that the Parent speak with Student about the seriousness of this behavior and indicated the likelihood that further elopement incidents would also require police notification, which the Private School would like to avoid. The director again asked the Parent to meet to discuss concerns and asked for the Parent's schedule to set up a meeting. The Parent did not provide her schedule. [NT 121-123; S-14, P-17]

51. The sole reason for Private School's contacting the police on the date of this incident was related to Student's safety. [NT 440]

52. Although Student would have been permitted to return to Private School after leaving the building on November 21, 2013, Student did not return and thereafter began attending High School on a full-time basis pursuant to an agreement between Parent and the District developed by their respective attorneys during the course of the hearing that was ongoing before another hearing officer in the fall of 2013. [NT 83, 101, 103, 502-503; S-16]

11

Legal Basis

Burden of Proof: The burden of proof, generally, consists of two elements: the burden of production [which party presents its evidence first] and the

burden of persuasion [which party's evidence outweighs the other party's evidence in the judgment of the fact finder, in this case the hearing officer]. In special education due process hearings, the burden of persuasion lies with the party asking for the hearing. If the parties provide evidence that is equally balanced, or in "equipoise", then the party asking for the hearing cannot prevail, having failed to present weightier evidence than the other party. Schaffer v. Weast, 546 U.S. 49, 62 (2005); L.E. v. Ramsey Board of Education, 435 F.3d 384, 392 (3d Cir. 2006). The United States Court of Appeals for the Third Circuit has applied the same burden to a case involving Section 504. Ridley S.D. v. MR., 680 F.3d 260 (3r d Cir. 2012). In the instant matter the Parent asked for the hearing and thus bore the burden of proof. As the evidence was not equally balanced the Schaffer analysis was not applied.

Credibility: During a due process hearing the hearing officer is charged with the responsibility of judging the credibility of witnesses, weighing evidence and,

accordingly, rendering a decision incorporating fmdings of fact, discussion and conclusions of law. Hearing officers have the plenary responsibility to make "express, qualitative determinations regarding the relative credibility and persuasiveness of the witnesses ". Blount v. Lancaster-Lebanon Intermediate Unit, 2003 LEXIS 21639 at *28 (2003); see also generally David G. v. Council Rock School District, 2009 WL 3064732 (E.D. Pa. 2009); T.E. v. Cumberland Valley School District, 2014 U.S. Dist. LEXIS 1471 *1142 (M.D. Pa. 2014); A.S. v. Office for Dispute Resolution (Quakertown Community School District, 88 A.3d 256, 266 (Pa. Commw 2014). Neither the Parent nor the Student testified at the hearing, although the Parent attended all three sessions and Student attended the second session. Testimony was provided by staff employed at the Private School at the time period relevant to this matter, including the director, the art teacher, and the two primary teachers. The District High School's special education liaison also testified. All witnesses

appeared to be testifying truthfully, answering questions completely and to the best of their recollections. Two witnesses merit additional credibility consideration. The art teacher testified at the second and the third hearing dates as his testimony was not finished after the second session. He is related to the director and works at several of the schools she has founded. He holds an undergraduate degree in fine art animation from the University of the Arts and is working on his Master's Degree in art education at Arcadia University [NT 282]; he has been a teacher for about 17 years. He presented as a candid witness who gave every indication of being fully cooperative with the hearing process. Despite his having been the teacher involved in the October 24, 2013 incident, in his demeanor and in his testimony over two hearing sessions and several hours of detailed direct and vigorous cross examination he evidenced no animus toward Student or the Parent and conveyed in his responses and his tone that he wished Student to receive help. The director, who holds an earned doctorate in school administration [NT 175] and in years gone by had been placed in a series of key administrative positions in the District, demonstrated memory difficulties which did not

12

appear to be feigned 2° some of which may have been related to pain medication following a fall and/or to a head injury from that fall, and/or to advancing age [NT 106, 135-142]. While these difficulties made her testimony less reliable in terms of dates and times, in areas that directly addressed the issue in this case her testimony was corroborated by other witnesses. Relevant to finding support for the credibility of the director's testimony by other witnesses is the fact that all witnesses had been sequestered at the request of Parent's counsel. On one point, related to who at Private School had authorization to contact police, her testimony apparently differed from what was proffered as having been testimony from another Private School staff person in the previous hearing

before another hearing officer. I fmd the director's testimony to be highly credible in this regard and give it more weight than the teacher's testimony as it is highly unlikely that an experienced administrator of programs for children would limit contacting the police to one person who may or may not be on the scene of a safety-related situation on any given day.

IDEA, Section 504 and Pennsylvania Chapter 15: In contrast to the IDEA, Section 504 emphasizes equal treatment, not just access to FAPE. The drafters of Section 504 were not only concerned with [a student] receiving a FAPE [as is the case with the IDEA] but also that a federally funded program does not treat a student differently because he or she is disabled. Chavez v. Tularosa Municipal Schools, 2008 WL 4816992 at *14 (D.N.M. 2008), quoting Ellenberg v. N.M. Military Inst., 478 F.3d 1262, 1281-82 n. 22 (10th Cir.2007)(quoting C. Walker, Note, Adequate Access or Equal Treatment: Looking Beyond the IDEA to Section 504 in a Post-Schaffer Public School, 58 Stan. L.Rev. 1563, 1589 (2006). Section 504 of the Rehabilitation Act of 1973 prohibits discrimination on the basis of a handicap or disability. 29 U.S.C. § 794. A person has a handicap if he or she "has a physical or mental impairment which substantially limits one or more major life activities," or has a record of such impairment or is regarded as having such impairment. 34 C.F.R. § 104.3(j)(1). Since the January 2009 effective date of the ADA Amendments Act of 2008, which expanded the defmitions of both "substantial impairment" and "major life activity" under §504 as well as the ADA, specific learning disability is explicitly included within the definition of a substantial impairment. Both reading and learning are explicitly included in the definition of major life activity. See 34 C.F.R. §104.3j(2)(i), (ii). See also, Protecting Students With Disabilities: Frequently Asked Questions About Section 504 and the Education of Children with Disabilities, found on the Office of Civil Rights (OCR) website.

The Commonwealth of Pennsylvania protects a student's right to be free from discrimination on the basis of handicap or disability, through Chapter 15 of the Pennsylvania Code, part of the regulations implementing the educational statutes of the Commonwealth. 22 Pa. Code Chapter 15. Similar to Section 504, Pennsylvania's Chapter 15 regulations require a substantial limitation with respect to education, defining a "protected handicapped student" as: A student who meets the following conditions: Is of an age at which public education is offered in that school district; has a physical or mental disability which substantially limits or prohibits participation in or access to an

20 At one point in the director's testimony, I called a private conference with counsel to discuss the witness's memory issues. [NT 135]

13

aspect of the student's school program; is not eligible as defined by Chapter 14 [relating to special education services and programs]; or who is eligible but is raising a claim of discrimination under §15.10 [relating to discrimination claims]. 22 Pa. Code §15.2. Chapter 15 by its terms is intended to implement students' rights under section 504, and it does not expand or limit those rights. 22 Pa. Code §15.11(c).

Several court decisions in Pennsylvania and elsewhere establish that IDEA eligible students may pursue a separate claim for discrimination under §504, notwithstanding IDEA eligibility. See, e.g., J.L. v. Ambridge Area School District, 2008 U.S. Dist. LEXIS 13451 (E.D. Pa. 2008); Mark H. v. Lemahieu, 513 F.3d 922 (9 th Cir. 2008), Chavez v. Tularosa Municipal Schools, 2008 WL 4816992 (D.N.M. 2008); Brenneise v. San Diego Unified School District, 2009 WL 1308757 (S.D. Cal. 2009). See, also, 22 Pa. Code §15.10: Notwithstanding other provisions of this chapter, an eligible or noneligible student under Chapter 14 (relating to special education services and programs) may use the procedures for requesting assistance under §15.8(a) (relating to procedural safeguards) to raise claims regarding denial of access, equal treatment or discrimination based on handicap. A student filing a

claim of discrimination need not exhaust the procedures in this chapter prior to initiating a court action under Section 504. Recently the Third Circuit held that plaintiffs bringing claims under the ADA and §504 may establish intentional discrimination with a showing of "deliberate indifference." S.H. v. Lower Merion Sch. Dist., 729 F.3d 248, 263 (3d Cir. 2013).

Retaliation: The 3r d Circuit recently joined the 1s t and 11 th U.S. Circuit Courts of Appeal in holding that parents must exhaust their administrative remedies before bringing retaliation claims that relate to the enforcement of IDEA rights. Batchelor ex rel. R.B. v. Rose Tree Media Sch. Dist., 63 IDELR 212 (3d Cir. 2014); See also Rose v. Yeaw, 32 IDELR 199 (1st Cir. 2000); MT. V. v. DeKalb County Sch. Dist., 45 IDELR 177 (11th Cir. 2006).

Filing a Due Process complaint under §504 or the IDEA is "protected activity" for purposes of a §504 retaliation claim. See 34 C.F.R. 104.61 [incorporating the anti-retaliation regulation of Title VI of the Civil Rights Act of 1964, 34 C.F.R. §100.7(e), providing, in pertinent part: "No recipient or other person shall intimidate, threaten, coerce, or discriminate against any individual for the purpose of interfering with any right or privilege secured by section 601 of the Act or this part, or because he has made a complaint, testified, assisted, or participated in any manner in an investigation, proceeding or hearing under this part."]. When parents engage in the process of seeking educational services for students with disabilities, including utilizing litigation if necessary, they should do so secure in the knowledge that engaging in those processes will not be held against them by the school district and that they will not be penalized for engaging in those processes.

To establish whether a school district has retaliated against a Parent for engaging in the processes under IDEA/Section 504, a three-part test has been elucidated, namely: (1) did the parents engage in protected activities, (2) was the school district's retaliatory action sufficient to deter a person of ordinary firmness from exercising his or her rights, and (3)

14

was there a causal connection between the protected activity and the retaliation. Lauren W. v. DeFlaminis, 480 F.3d 259 (3d Cir. 2007). To prove a "causal connection" in a retaliation case a plaintiff may prove "either (1) an unusually suggestive temporal proximity between the protected activity and the allegedly retaliatory action, or (2) a pattern of antagonism coupled with timing to establish a causal link " Burger v. Sec y of Revenue, 575 Fed. App'x 65, 68 (3d Cir. 2014) (citing Lauren W., 480 F.3d at 267).

The District may be held liable under § 504 for providing "significant assistance" to Private School if Private School retaliated against Petitioners. The implementing regulations for §504 provide, in pertinent part: A recipient [of federal funds], in providing any aid, benefit, or service, may not, directly or through contractual, licensing, or other arrangements, on the basis of handicap: Aid or perpetuate discrimination against a qualified handicapped person by providing significant assistance to an agency, organization, or person that discriminates on the basis of handicap in providing any aid, benefit, or service to beneficiaries of the recipients program or activity.34 C.F.R. §104.4(b)(1)(v) The appendix to the Code of Federal Regulations, 34 C.F.R. § 104.4(b)(1)(v) clarifies the meaning of "significant assistance": Section 104.4(b)(1) (v) prohibits a recipient from supporting another entity or person that subjects participants or employees in the recipient's program to discrimination on the basis of handicap. This section would, for example, prohibit financial support by a recipient to a community recreational group or to a professional or social organization that discriminates against handicapped persons. Among the criteria to be considered in each case are the substantiality of the relationship between the recipient and the other entity, including financial support by the recipient, and whether the other entity's activities relate so closely to the recipient's program or activity that they fairly

should be considered activities of the recipient itself. See Adam C. v. Scranton Sch. Dist., No. 3:07-CV-532, 2011 U.S. Dist. LEXIS 27423 (M.D. Pa. Mar. 17 2011) (denying private school's summary judgment motion where private school provided "significant assistance" to school district).

Discussion

As framed in the Parent's Closing Brief: "This is a case of retaliation against [Student] and [Student's] parent, [Parent] ("Petitioners") by two entities, [Private School] a private school for children with special needs, and the School District (the "District," together with [Private School], "Co-Defendants")."

As noted earlier, the three-part test for a successful retaliation claim under Section 504 in this circuit is contained in Lauren W: a protected activity, retaliatory behavior[s] acting sufficient to act as a deterrent to exercising the protected activity, and a causal connection between them, the causal connection being an unusually suggestive temporal proximity between the protected activity and the allegedly retaliatory action, or a pattern of antagonism coupled with timing to establish a causal link Private School and/or the District may defeat the claim of retaliation by showing that it would have taken the same action even if Parent had not engaged in the protected activity.

15

Did the Parent engage in a protected activity? Here, the protected activity is the Parent's advocacy for Student's rights under the IDEA, specifically her retaining an attorney to assist in IEP meetings and through counsel filing two due process complaints against the District. The first of these complaints was adjudicated in June 2012, and the second was being litigated from late May 2013 through late January 2014 with a final adjudication in mid-March 2014. There is no dispute that the Parent engaged in a protected activity.

Did Private School, in conjunction with or significantly assisted by the District engage in

retaliatory action[s] sufficient to deter a person of ordinary firmness from exercising his or her rights? The alleged retaliatory behavior is the Private School's calling the police on two occasions and the District's allegedly condoning or supporting the Private School's actions. In the instant matter it is first necessary to determine whether Private School's actions were reasonable or retaliatory with respect to Student's behaviors. There is no question that first and foremost schools must be committed to maintaining a safe atmosphere in the learning community for the welfare of students and staff. Only when a school is safe is the environment conducive to learning. During the time period relevant to this decision, Private School was a very small educational setting serving eight or nine students with two full time teachers, several part time teachers and the director. Private School teaching staff who were employed during the time relevant to this decision had not ever experienced any incidents of a student putting his/her hands on them in a forceful manner, and had never incurred any injuries resulting from a physical confrontation with a student. Moreover, in the thirty year history of the school there had been no instances of a student engaging in physical aggression. The art teacher testified that at times students had been verbally threatening, but no student had ever been physically aggressive. It is in this context that we must view Private School's determination that the October 24 th incident was a serious incident and that issuing a two-day suspension 21 and notifying the police was a correct course of action. The Parent claims that the Private School's response was out of proportion to the severity of the incident. I must respectfully disagree. While student-on-student violence, and student-on-staff violence, and perhaps at times even staff-on-student violence is not an unheard of occurrence in large public urban and suburban schools, and likely also present at times in large private or parochial schools, violence was not part of the experience of students or staff at Private School, an intimate learning community. Private School had every right to preserve safety within its

walls, and while calling the police and filing an incident report might be thought to be an "over reaction" to a "minor incident" in a different setting, it was a justifiable response by the Private School. Indeed and significantly, a police detective, upon review and further consideration, deemed Student's actions to be serious, supporting the premise that the Private School's action was not an "over-reaction"; in fact the police detective acting on his own judgment initiated a case in Juvenile Probation. I do not find that by filing a police report regarding the October 24 th incident the Private School acted in a retaliatory manner in response to the Parent's vigorous advocacy on

21 To the extent that Parent may argue that there should have been a manifestation determination meeting, such was not required. A two day suspension of a Student who does not have an intellectual disability and who has not accumulated 15 days of suspension or experienced a pattern of suspensions is not a change in placement and does not require a manifestation determination.

16

behalf of her child. As to any complicity on the District's part, even if I had found that the Private School acted unreasonably, or even in a retaliatory manner, which I do not, the District had no involvement in the Private School's decision-making process around the October 24 th incident and its support of Private School through tuition payments under contract is much too tenuous a connection to establish complicity.

Turning to the incidents of November 15 th and November 21s t, I find the Private School's actions eminently reasonable, justified, and necessary. When a child is at school the school is acting in the place of the parent[s] and has the duty to protect the child. As the director and her staff all testified, the school was responsible for Student's safety. When it was discovered that Student had eloped from the school, after offering a pretext for leaving class, it was incumbent upon the Private School to initiate the

District's standard protocol, which it also had to follow, of notifying the police that a child was missing. Notably, on November 15 th school staff initially tried unsuccessfully to reach the Parent to see if she could account for Student's having left. Fortunately, just before the police were about to be notified the Parent called and assured the staff that Student was safe and had left because of a family emergency. This situation could easily have been avoided had the Parent contacted the school before asking Student to leave. On November 21s t, a week later, when Student eloped after complaining of a racing heart, the school did reach the Parent. However, the Parent said that she did not know where Student was but "thought [Student] was all right". I cannot imagine a responsible school staff failing to act to locate a student when a parent admits that she does not know for sure where her child is. We do not have to go any further than recent news headlines to imagine a scenario where a student leaves school without permission, the parent states she does not know where child is but "thinks" the child is alright, the school fails to take further action to locate the child and the child suffers a pedestrian or vehicle accident, or abduction, or serious harm or even death. Under those circumstances a parent surely and justifiably would file a lawsuit of a very different kind against a school.

Was there a causal connection between the Parent's engaging in a protected activity and the actions taken by the Private School? The issue of causation is usually the most difficult element to prove in a retaliation claim There is no dispute that the Parent engaged in a protected activity or that Private School engaged in the conduct that Parent ascribes to it. However, there is no evidence of a causal relationship between the two, and furthermore the evidence clearly establishes that Private School would have taken the same actions even if Parent had not engaged in the protected activity. I heed the 3r d Circuit Court's caution in Lauren W:

"[a] court must be diligent in enforcing these causation requirements because otherwise a public

actor cognizant of the possibility that litigation might be filed against him, particularly, in his individual capacity, could be chilled from taking action that he deemed appropriate, and, in fact, was appropriate."

After careful review of the evidence before me I find no causal connection between the actions of Private School and the Parent's prior requests for due process. I fmd that the Private School acted prudently and in a manner consistent with the culture of the school

17

and its duty to protect its students. Further, examining the components of causality, the Parent's allegations would fail both with regard to unusually suggestive temporal proximity between the protected activity and the allegedly retaliatory action, and a pattern of antagonism coupled with timing.

With regard to temporal proximity, the due process proceeding ODR#3111/11-12 KE that concluded on June 18, 2012 was so remote in time as to render any allegation of temporal proximity unsupportable. Further, the proceeding ODR #13887/12-13 AS was initiated on May 15, 2013 whereas the first alleged retaliatory action occurred on October 24, 2013. During the period between May 2013 and late October 2013 Private School actively supported Student's participation in the High School vocational program through providing academic instruction and through close collaboration with the High School. Of additional note, neither due process complaint was filed against Private School.

With regard to a pattern of antagonism coupled with timing, I find no evidence in testimony, in witness demeanor, or in documents to support this allegation. The Private School witnesses were each highly credible as they explained that Private School's actions in question were in the first instance related solely to Student's serious breach in the school's expectations and experiences regarding physical aggression, and in the second and third instances related solely, for Student's own safety, to the need to determine this teenage Student's whereabouts in the

community during the hours of the day when it would be expected that a person Student's age would be in school. In contrast to any pattern of antagonism, the witnesses furthermore established that Private School staff was highly involved in supporting Student's success in the academic requirements of Student's High School vocational program in which Student was apparently excelling.

Conclusion

The testimony of every witness, and the content of each exhibit, was considered in issuing this decision, regardless of whether there is a citation to particular testimony of a witness or to an exhibit. The parties' closing briefs were also carefully considered. The Parent failed to meet her burden of proof that Private School acted in a discriminatory or retaliatory manner toward Student or herself. Further, as the Parent adduced no evidence to support her claim that the District directly retaliated against herself or Student, the Parent's claims against the District relying solely on an agency theory, said claims must be denied.

18

Order

It is hereby ordered that:

Neither the District, through its agent Private School, nor the Private School, acted in a discriminatory and/or retaliatory manner toward Student and/or Student's Parent because the Parent had filed previous due process complaints.

Any claims not specifically addressed by this decision and order are denied and dismissed.

December 17, 2014 Linda M. Va(entini, Psy.D., COO

Date Linda M. Valentini, Psy.D., CHO

Special Education Hearing Officer NAHO Certified Hearing Official

19

APPENDIX ONE

Ruling on Motion to Dismiss

Case Name: Student v. School District of Philadelphia and Private School

ODR #: 14498/13-14-AS

Date: December 13, 2013

Background:

On December 4, 2013 the Parent through counsel filed a due process complaint alleging that the School District of Philadelphia [District] and its agent [Private School] had violated Student's rights under Section 504 of the Rehabilitation Act of 1973 [Section 504], PA Chapter 15 [Chapter 15] and the Americans with Disabilities Act [ADA] by engaging in discriminatory and retaliatory acts against Student.

In accordance with the prescribed timelines, a hearing was scheduled for December 17, 2013, within the 30-day window from the date of the filing of the complaint. Unlike due process cases filed under the IDEA which have a Decision Due Date [DDD] identified from the outset [Footnote: The DDD can be extended for good cause at the request of either party, for example to allow for additional hearing dates or to accommodate a schedule for closing briefs], with Section 504 cases there is not a specific DDD set initially; rather, the decision is due 15 days after the record is closed, either through receipt of the final transcript or receipt of written closing briefs, whichever is later.

The Parent asserts that the alleged discrimination/retaliation is related to her filing and pursuing due process complaints against the same defendants asserting denial of FAPE. An earlier complaint, ODR# 3111-11-12, was adjudicated before Hearing Officer Jake McElligott and a final Order was issued on June 18, 2011. Another matter, ODR#13887/12-13 [hereinafter IDEA Action] was filed on May 15, 2013 and is currently pending before Hearing Officer Anne Carroll; testimony has been taken in that matter and additional witnesses are expected to appear.

On December 11, 2013 the District through counsel filed a Motion to Dismiss, arguing that the hearing officer lacks jurisdiction because hearing

20

officers cannot award monetary damages, because at least one hearing officer has said that Parents may not have a due process hearing solely on discrimination-based claims, and that any denial of FAPE claims are already before Hearing Officer Carroll in the IDEA Action.

The Parent through Counsel responded to the District's Motion on December 12, 2013. The Parent argues that hearing officers in this jurisdiction have adjudicated Section 504/Chapter 15 claims, that hearing officers in this jurisdiction have adjudicated claims involving ADA/504 claims that are both FAPE and discrimination based, and that the issues currently before Hearing Officer Carroll in the IDEA Action are not the same as the issues in the hearing before me.

In order to give full consideration to the Motion and the Response, I again reviewed the complaint filed in the matter before me and also requested from counsel and reviewed a copy of the due process complaint in the IDEA Action before Hearing Officer Carroll.

Discussion:

Damages: It is clear that hearing officers do not have the authority to award compensatory money damages for Section 504 issues, for ADA issues, for IDEA issues or for any other issues. Likewise, we do not award attorney fees.

Jurisdiction: I have not found any source of authority granting special education hearing officers jurisdiction over ADA-only claims. However, 22 Pa. Code Sections 14.102(a)(1), 14.102(a)(2), and 15.1(a) bestow broad jurisdiction over complaints brought under the IDEA and under Section 504 and I read these as including complaints about discrimination/retaliation. [Footnote: What is not clear, and what I will expect counsel to brief, is what authority if any is afforded to me to adjudicate claims against a private school such as [Private School] in

Copyright © 2020 LRP Publications                                    15

any way that is separate from the LEA who by virtue of a student's residence is responsible for providing or procuring the student's special education services.] While there is no requirement to exhaust administrative remedies when bringing non-FAPE related 504 claims, neither is there any prohibition against choosing a due process hearing.

Pendency of a Prior Action: The District argues that any denial of FAPE allegations contained in the 504 complaint are already subject to the

21

jurisdiction of Special Education Hearing Officer Anne Carroll in the IDEA Action and therefore precluded under the doctrine of pendency of a prior action. There is no question that if there are overlapping identical claims in both complaints, I am precluded from addressing those specific claims.

In reading and comparing the IDEA Action complaint and the 504

complaint, I find that the precise issue in the 504 complaint, as put forth at numbers 28 through 44, is based on events occurring after the complaint in the IDEA Action was filed and is separate from the issues in the IDEA Action. The description of FAPE-related information in the 504 complaint [specifically numbers 9 through 27 and number 45] is background information only and not directly germane to discrimination/retaliation.

Unfortunately, a clear instance of overlap enters the picture, as item number 46 of the 504 complaint reads: "On November 27, 2013 the Due Process Hearing [IDEA Action] continued. [Private School] staff member, [Ms. C., testified during the due process hearing that 1) only [Dr. B] has the

authority to call the police; 2) Mr. H is a relative of B." This item clearly relates to the fact finding that will be necessary in the 504 hearing. Additionally, although it is a vague assertion as to which factual allegations are referenced, I must take seriously the District's contention in its Motion that "In fact, the factual allegations underlying Petitioners' Complaint

were the subject of extensive examination of District witnesses by Parent's counsel in the proceedings before Hearing Officer Carroll."

Conclusion:

I am denying the District's Motion to Dismiss. However, given that there has already been testimony in the IDEA hearing that squarely addresses content pertinent to the 504 hearing, and in order to prevent the possibility of two hearing officers finding disparate facts based on the same evidence, we will proceed as follows: The 504 hearing will convene as scheduled on December 17, 2013 at 1:30 pm. at which time I will enter the customary preliminary remarks into the record. Following my remarks counsel will be invited to present their opening statements which, given the circumstances, may be more detailed than usual. We will then adjourn the hearing and reconvene only after the hearing pending under Hearing Officer Carroll has concluded and she has filed her decision.

**Cases Cited**
513 F.3d 922
729 F.3d 248
63 IDELR 212
480 F.3d 259
575 F. App'x 65

117 LRP 21589

## Walter D. Palmer Leadership Learning Partners Charter School

## Pennsylvania State Educational Agency

### 15959-1415AS

### 15960-1415AS

### March 31, 2017

**Judge / Administrative Officer**

**Michael J. McElligott, Hearing Officer**

## Full Text

### DECISION

CLOSED HEARING & STIPULATED RECORD1

1 Following remand of these matters from the US. District Court for the Eastern District of Pennsylvania to this hearing officer, and as set forth below, the parent and the PA Department of Education submitted a stipulated factual record in February 2017. While not made explicit between the parties, this decision is considered to be the result of a closed hearing process.

2

INTRODUCTION

[The student] ("student") 2 is [a late elementary school-aged] student residing in the [redacted school district]. The student qualifies under the terms of the Individuals with Disabilities in Education Improvement Act of 2004 ("IDEA") 3 for specially designed instruction/related services as a student with autism, specific learning disability, and speech/language impairment.

The procedural background in these matters is intricate. As set forth more fully below, the student attended the Walter D. Palmer Leadership Learning Partners Charter School ("[] CS"). In December 2014, the student's parent was informed by the CS, along with the families of other students attending the school, that it would cease operations. Thereafter, the

student began to attend, and currently attends, [the local school district].

In March 2015, the parent filed with the Office of Dispute Resolution ("ODR") a special education due process complaint against the CS to which ODR assigned the ODR file number 15959-1415AS. The complaint alleged that the CS had denied the student a free appropriate public education ("FAPE"). In the same complaint, parent alleged that,

2 The generic use of "student", rather than a name and gender-specific pronouns, is employed to protect the confidentiality of the student.

3 20 U.S.C. §§1400 et seq.

3

since CS was no longer operational, the Pennsylvania Department of Education ("PDE") was responsible for remedying the alleged denial of FAPE. ODR assigned ODR file number 15960-1415AS to this complaint against PDE.

Those complaints began a chain of subsequent filings, rulings, and appeals to federal court which, ultimately, culminated in the issuance of this decision at both ODR file numbers, which have been consolidated for purposes of issuing this final decision in both matters.

PROCEDURAL BACKGROUND

A. The student attended the CS in kindergarten in the 2013-2014 school year. (Hearing Officer Exhibit ["HO"]-1 - Complaint at 15959-1415AS & 15960-1415AS ["Parent's Complaint"]; HO-7 - Hearing Officer April 2015 Ruling/15959-1415AS ["Ruling at 15959-1415AS"]; HO-8 - Hearing Officer April 2015 Ruling/15960 ["Ruling at 15960-1415AS"]).

B. In June 2014, the parent, through an agreement negotiated by her counsel at the time, entered into an agreement with CS, including the CS undertaking obligations to provide an independent educational evaluation, to establish a compensatory education fund, and to seek placement of the student in an Approved Private School for students with

disabilities. (HO-3 - Parent's Response to PDE Motion to Dismiss ["Parent's Response to PDE Motion"] at

4

pages 13-19; HO-7 - Ruling at 15959-1415AS; HO-8 - Ruling at 15960-1415AS).

C. The student returned to CS for 1st grade, the 2014-2015 school year. (HO-1 - Parent's Complaint).

D. On or about December 31, 2014, in the midst of the student's 1st grade year, the CS closed its doors, ceased operations, and entered receivership/settlement-of-claims status in the hands of a liquidating trustee. (HO-6 - Email re: Liquidating Trustee; HO-9 - Federal Court October 2016 Opinion/Remand).

E. Thereafter, the student began to attend, and currently attends, [a public school]. (HO-1 - Parent's Complaint; Stipulated Findings of Fact #15, #16).

F. In March 2015, parent, utilizing her current counsel, on behalf of student filed with ODR a special education due process complaint in one document, containing allegations against CS and PDE. Respectively, the complaints were assigned ODR file numbers 15959-1415AS and 15960-1415AS. (HO-1 - Parent's Complaint.)

G. Throughout these proceedings, an individual acting as a former administrator at CS, and utilizing a CS email address, has been intermittently responsive to requests and communications sent to him by this hearing officer. Throughout these proceedings and through the date of this decision, however, CS has not identified

5

counsel nor has it responded through counsel in any substantive way. (HO-5 - Email re: CS Contact). 4

H. PDE responded to the parent's March 2015 complaint, including in its filing a motion to dismiss. (HO-2 - PDE's Response to Complaint/Motion to Dismiss).

I. The parent filed a response to PDE's motion to dismiss. Thereafter, the parties exchanged further filings related to the motion. (HO-3 - Parent's Response to PDE Motion; HO-4 - PDE Reply to Parent's Response to PDE Motion & Parent's Sur-Reply to PDE's Reply).

J. In April 2015, this hearing officer issued rulings dismissing the complaints at ODR file numbers 15959-1415AS and 15960-1415AS. (HO-7 - Ruling at 15959-1415AS; HO-8 - Ruling at 15960-1415AS).

K. Parent's complaint at 15959-1415AS, filed against CS, was dismissed for lack of jurisdiction, finding that the dispute between the parties was contractual in nature--arising out of the June 2014 settlement agreement--a dispute over which special

4 Over the period November 2016 - January 2017, counsel for both the parent and PDE, and this hearing officer, were collaborating about the potential for a stipulated factual record (see Procedural Background at O). A hearing session was scheduled in a companion case on February 1, 2017, to be convened at the offices of parent's counsel. Instead, the hearing session was cancelled and the date/time was utilized for counsel and the hearing officer to hold a conference call regarding the potential stipulations in the instant matter and similar companion cases. The CS individual, who has always been copied on communications by this hearing officer, was notified that the February 1st hearing session was cancelled. However, that morning he appeared at the offices of parent's counsel, anticipating that he would be attending the cancelled hearing session. He was informed that the hearing session would not take place and, subsequently, this hearing officer emailed him regarding the stipulation process that was underway. HO-10.

6

education due process did not have jurisdiction. (HO-7 - Ruling at 15959-1415AS).

L. Parent's complaint at 15960-1415AS, filed

against PDE, was dismissed for lack of ripeness, finding that any claim against PDE could proceed only after ascertaining the student's position vis a vis the CS after the receivership/settlement-of-claims process had run its course. (HO-8 - Ruling at 15960-1415AS).

M. In July 2015, parent filed with the U.S. District Court for the Eastern District of Pennsylvania ("Court") an appeal of the dismissal of the complaints at 15959-1415AS and 15960-1415AS. (HO-9 - Federal Court October 2016 Opinion/Remand).

N. In October 2016, the Court issued its opinion, finding that the hearing officer rulings at ODR file numbers 15959-1415AS and 15960-1415AS were issued in error. In its order, the Court vacated those rulings and remanded these matters to this hearing officer "with instructions to hold due process hearings to determine in the first instance whether ([]CS) denied (student) a FAPE, and if so, in accordance with the concurrently issued Opinion, what remedy, if any, Plaintiffs are owed by Defendant Commonwealth of Pennsylvania Department of Education." (HO-9 - Federal Court October 2016 Opinion/Remand, 2016 U.S. Dist. LEXIS 148904 at 9 [parentheticals edited for stylistic consistency]).

O.

7

Over the course of November and December 2016, and January 2017, counsel for the parent and PDE worked collaboratively with each other and with this hearing officer to see if this matter could be adjudicated on a stipulated factual record. Ultimately, that was the result and, in February 2017, the parent and PDE submitted factual stipulations (including stipulated exhibits) to serve as the factual basis of the decision. (HO-10 - Emails re: Stipulated Record).

While the parties stipulated to the factual record in these matters, set forth in the Stipulated Findings of Fact section below, including a compensatory education remedy, they could not reach agreement on one aspect of that remedy. (HO-11 - Parent!PDE Stipulations).

Specifically, the parent and PDE stipulated to a quantitative amount of compensatory education hours as a remedy but could not stipulate as to an hourly rate for valuing those hours. (HO-11 - Parent!PDE Stipulations).

Each party submitted briefs on the issue of valuing the compensatory education hours. (HO-12 - Parent's Brief re: Compensatory Education; HO-13 - PDE's Brief re: Compensatory Education).

8

S. This hearing officer accepted the stipulations and stipulated exhibits, both of which form the basis for this decision and order. 5

ISSUE

What should be the value

of the compensatory education hours,

agreed to between the parent and PDE as a remedy

in this matter?

STIPULATED FINDINGS OF FACT

The parent and PDE hereby submit the following stipulations and incorporate by reference the below listed documents in lieu of an evidentiary hearing for the time period September 16, 2013, through December 31, 2014, (the time period at issue in the above-captioned matter) and agree as follows:

Background

Parent, M.T., is the mother of [the student] ("student").

Student [is late elementary school-aged].

[The] CS was a charter school [] until approximately December 31, 2014.

While it operated as a charter school, CS was a local education agency ("LEA").

5

The findings of fact are entirely drafted by counsel for parent and PDE. This hearing officer, having reviewed the stipulations of those parties and the stipulated exhibits, accepts the stipulated findings of fact as drafted. For stylistic consistency with his decision-writing, however, certain stylistic or grammatical changes have been made. Also, given the hearing officer's use of "[] CS," that designation is used in this decision, even though the parties utilized a different designation in the stipulations; certain other designations in the stipulations are used earlier in the decision and are carried over into the stipulations. Finally, so that the parties, or a reviewing body, can be assured that the stipulated findings of fact are adopted here in their entirety, the parties' submitted stipulations are included in the record as HO-11.

5.

9

While it operated as a charter school, CS received federal financial assistance.

6.

PDE is Pennsylvania

's state education agency ("SEA") as defined by the IDEA. 20 U.S.C. §1401(32).

PDE receives federal financial assistance.

At all times relevant, the student was identified with autism, specific learning disability, and speech or language impairment, as those terms are defined in the IDEA. 20 U.S.C. §1400 et seq.

As a result of the student's disabilities, at all times relevant, the student was eligible for special education services pursuant to the IDEA.

At all times relevant, the student was enrolled in CS.

At all times relevant, CS was the student's LEA, as defined by the IDEA. 20 U.S.C. §1401(19).

Student began attending CS in or around September 2013 when the student was in kindergarten.

On or around May 19, 2014, while still enrolled in CS as a kindergarten student, the student was placed at [a private] School by the student's individualized education program ("IEP") team.

[Private] School is an Approved Private School ("APS") serving students with autism, neurological impairment, and emotional disturbance.

Following the CS's closure in December of 2014, the parent enrolled the student in [a public school district].

The student's current LEA is the public school district.

In May 2016, while enrolled in the public school district, the parent enrolled the student in [another] School.

As the SEA, PDE has general supervisory obligations related to a LEA's implementation of the IDEA and is responsible for ensuring that eligible students receive a FAPE. 20 U.S.C. §1412(a)(11).

19.

10

Parent contends that the CS is unable to provide any compensatory education remedy to the student due to the CS's closure.

20.

PDE does not dispute that the CS is unable to provide any compensatory education remedy to the student.

Pursuant to the IDEA, PDE, as the SEA, is required to provide educational services to a student when a LEA is unable or unwilling to provide educational services to which a student is entitled. 20 U.S.C. §1413(g).

PDE will make available to the student the compensatory education services that CS owes to the student due to the CS's failure to provide FAPE to the student.

At some point during the 2013-2014 school year, there was a dispute or disagreement between the parent and CS related to the educational services that CS should have provided to the student.

On or about June 9, 2014, parent, with the advice of counsel, entered into a settlement agreement with CS ("settlement agreement").

The settlement agreement provided that the student was owed a certain amount of compensatory education.

The parties do not dispute that CS closed without providing any of the compensatory education identified in the settlement agreement as owed to the student.

On March 2, 2015, after CS closed, parent filed a due process complaint with ODR against CS and PDE.

ODR bifurcated the due process complaint, assigning separate docket numbers as to the CS (docketed at 15959-1415AS) and PDE (docketed at 15960-1415AS).

Parent first notified PDE on March 2, 2015 after CS closed of concerns or issues associated with the educational services that CS provided to the student with the filing of the due process complaint in this matter, docketed at 15960-1415AS.

On March 12, 2015, PDE sought dismissal of the due process complaint docketed at 15960-1415AS alleging that ODR lacked jurisdiction over PDE, and the parties briefed the issue.

31.

11

On April 27, 2015, the hearing officer issued two rulings related to the student's due process complaint.

32.

The April 27, 2015 ruling docketed at 15959-1415AS dismissed the due process complaint as to CS for lack of jurisdiction due to the existence

of the settlement agreement, indicating that the parent must seek to enforce the settlement agreement through the

CS's liquidation process.

The April 27, 2015 ruling docketed at 15960-1415AS denied PDE's motion to dismiss but dismissed the due process complaint as to PDE for lack of ripeness.

Parent appealed to federal court seeking remand to the hearing officer for a due process hearing associated with the time period prior to the June 9, 2014 settlement agreement ("T-1") as well as the time period following the June 9, 2014 settlement agreement through the December 2014 closure of CS ("T-2").

The federal court vacated the hearing officer's rulings and remanded the cases for a due process hearing related to T-1 and T2.

PDE's Investigation

PDE investigated the claims made in the March 2, 2015 due process complaint.

On May 6, 2015, PDE issued a fact-finding report regarding the claims set forth in the due process complaint related to the alleged failure of CS to provide the student with FAPE and sent a letter and a copy of the report to the parent on the same day. (Stipulated Exhibit-1).

PDE found that CS failed to provide the student with FAPE for the time period from September 16, 2013 (the first day of kindergarten) through April 30, 2014 and the student was owed 606.3 hours of compensatory education. (Stipulated Exhibit-1).

Following the federal court's remand for a due process hearing related to T-1 and T-2, PDE investigated further and issued an amended fact-finding report on December 14, 2016, and a corrected cover letter on December 15, 2016. (Stipulated Exhibit-2, Stipulated Exhibit-3).

40.

12

The amended fact-finding report and corrected cover letter explain that the student is owed 644 hours of compensatory education due to CS's failure to provide FAPE to the student for the time period September 16, 2013 (the first day of kindergarten) through May 16, 2014 (the last day the student attended CS). (Stipulated Exhibit-2, Stipulated Exhibit-3).

41.

The amended fact-finding report further asserted that the student made progress while placed at [the other] School between May

19, 2014 and the December 2014 closure of CS. (Stipulated Exhibit-2, Stipulated Exhibit-3).

Subsequently, upon consideration of additional information, PDE determined that the student is owed an additional 450 hours of compensatory education for the time period May 19, 2014 (the student's first day at [the other] School) through December 31, 2014 (when CS closed). (Stipulated Exhibit-4, Stipulated Exhibit-5).

In resolution of this matter, the parties agree that the student is owed a total of 1,094 hours of compensatory education (644 hours from September 16, 2013 through May 16, 2014, and 450 hours from May 19, 2014 through December 31, 2014) due to CS's violations of IDEA.

PDE believes the compensatory education services should be valued at an average of $65 per hour for a total of no more than $71,110.

Parent believes the compensatory education should be valued at $78.67 per hour.

The parties agree that the compensatory education hours may be used by the parent in her sole discretion, so long as:

the provider of the services is properly credentialed, licensed, or certified;

the use of the compensatory education is not intended to relieve the LEA of its obligation to provide the student with FAPE; and

the services take the form of appropriate developmental, remedial, or enriching instruction or services that further the goals of the student's current or future IEPs, remediate past denials of FAPE, or overcome the effects of the student's disability. These hours may be used for services,

13

resources, and/or materials such as, but not limited to, tutoring, summer programs, after-school programs, or software.

47. Outside of the procedural Hearing Officer Exhibits developed

over the course of these proceedings and incorporated as part of the stipulated record, the parties stipulate that the following documents are hereby incorporated by reference and admitted into the record by stipulation, and that the following documents comprise the entirety of the substantive evidence in this matter:

Stipulated Exhibit-1: Fact-Finding Report dated May 6,

2015

Stipulated Exhibit-2: Amended Fact-Finding Report dated

December 14, 2016

Stipulated Exhibit-3: Corrected Cover Letter dated

December 15, 2016

Stipulated Exhibit-4: Student Report Card for 2014-2015

School Year from [the other] School

Stipulated Exhibit-5: Student Discipline Reports from T-2

Period from [the other] School

DISCUSSION AND CONCLUSIONS OF LAW

The sole issue to be decided in this decision, the issue to which parent and PDE could not stipulate, is the value of the 1,094 hours of compensatory education which the parties agree is the appropriate compensatory education remedy. Parent asserts that each hour of compensatory education should be valued at $78.67. PDE asserts that each hour should be valued at $65.00.

Parent's argument centers on a calculation offered by this hearing officer in the consolidated decisions at X.J. v. (Palmer CS)/PDE, 15961-1415AS/15962-1415AS (McElligott, August 11, 2015). There, in a

14

dispute involving a denial-of-FAPE claim by a student against the CS and PDE (under identical theories as in the instant case, although without any prior settlement agreement having been entered into between that family and CS), this hearing officer awarded compensatory education to the student, compensatory education for which PDE was responsible.

In disputes where compensatory education had been awarded, it had been the long-standing practice of this hearing officer to award compensatory education with a financial limit:

'The costs to the District of providing the awarded hours of compensatory education must not exceed the full cost of the services that were denied. Full costs are the hourly salaries and fringe benefits that would have been paid to the District professionals who provided services to the student during the period of the denial of FAPE.'

This standard and language were employed consistently whenever this hearing officer found it necessary to award compensatory education. Uniformly, however, the exact calculation of the value of the compensatory education hours was left in the hands of parties, to be worked out between them based on this standard/language. 6

In X.J. v. Palmer CS/PDE, however, because Palmer CS was defunct, and the exact calculation of the value of the compensatory education hours was likely to be impossible under this

6

Because this approach

--

utilizing hearing officer-determined hourly rates in valuing a compensatory education award (even when utilizing only the general salary and benefits standard/language)

--

might be viewed as an award of money damages, a remedy unavailable through special education due process, this hearing officer has subsequently moved away from such language.

15

standard/language, this hearing officer provided an exact amount for the value of the compensatory education hours. The exact amount, $78.67, was calculated on a salary figure derived for teachers at the School District. Subsequently, two Pennsylvania special education hearing officers utilized this figure in valuing a compensatory education award for the purposes of a lump-sum to be placed in a compensatory education trust administered by a third party for the benefit of a student. [ I.M. v. School District of Philadelphia, 16189-1415KE (Skidmore, January 8, 2016); Q.H. v. School District of Philadelphia, 16378-1415AS (Culleton, November 9, 2015)].

PDE argues that an hourly rate of $65.00 in valuing the compensatory education hours is reasonable and equitable. Similar to the hearing officer's calculation derived in X.J. v. Palmer CS/PDE, the calculation offered by PDE is based on average salaries for teachers in the School District. In many ways, it is a more precise, and arguably more reliable, calculation than the one developed by this hearing officer in X.J. v. Palmer CS/PDE.

On balance, as indicated in footnote 6, it would be the preference of this hearing officer, and would be in keeping with his current practice, to avoid any sense of valuing the compensatory education award, whether generally through the former standard/language or specifically through an exact hourly rate. But the parties have developed factual stipulations in every regard of the dispute except for an hourly rate in

16

valuing the compensatory education hours and expect that this decision can break that impasse. Therefore, it is incumbent uponthis hearing officer to speak to the issue with specificity.

The hourly rate in valuing the compensatory education award will be $78.67. The reason for this, however, is not rooted in the argument presented by the parent. Instead, it is rooted in equitable considerations related to the chronological nexus between the instant matter and X.J. v. (Palmer CS)/PDE, 15961-1415AS/15962-1415AS. The instant matter was initiated on March 2, 2015 with ODR file numbers 15959-1415AS and 15960-1415AS. The complaint which led to the decision at X.J. v. (Palmer CS)/PDE, 15961-1415AS/15962-1415AS was filed on the same day. Indeed, the complaints were assigned sequential ODR file numbers upon filing. Therefore, it would be indefensible, in terms of the equities, for the compensatory education award for X.J. to be explicitly valued at $78.67 per hour and the award for [the student] in a complaint filed at the same time

--

and resolved on the merits in largely the same way albeit some time later based on procedural complexities

--

, to be valued at some other hourly rate.

Accordingly, the exact value of the compensatory education award stipulated to between the parent and PDE shall be calculated utilizing an hourly rate of $78.67 per hour.

17

*

ORDER

In accord with the stipulated findings of fact and discussion set forth above, the parties agree that as the result of denial of FAPE by the now-defunct Charter School, the Pennsylvania Department of Education shall provide to [the student] 1,094 hours of compensatory education as a remedy. The value of these compensatory education hours shall be $78.67 per hour. Details related to the access, use, and nature of these compensatory education hours were stipulated between the parent and the Pennsylvania Department of Education at stipulated finding of fact #46 and are adopted verbatim as part of this order.